[No. 21122-0-II.    Division Two.    January 30, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. JEMAINE DEON PETTUS, *Appellant*.

*Pattie Mhoon*, for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney*, and *John M. Neeb, Deputy*, for respondent.

SEINFELD, J. — Jemaine Pettus was convicted of first degree murder. On appeal, he alleges that the trial court provided an erroneous instruction defining "extreme indifference to human life," erred in allowing the State to add a drug delivery charge more than 60 days after the arraignment date, and improperly failed to instruct the jury on lesser included offenses. Finding no error, we affirm.

## FACTS

One morning, Pettus, James Henderson, and James Horton were selling rock cocaine in the Hilltop area in Tacoma. Horton worked as a "middle man," selling the drugs that Pettus and Henderson provided him and then turning the money over to Pettus and Henderson.

Shortly before noon, Don Cady drove up in a blue Jeep and gave Horton a $20 bill in exchange for a rock of crack cocaine. Horton then told Pettus and Henderson that Cady had "ripped them off." In response, Pettus and Henderson went to their car. Pettus obtained a loaded .357 revolver from the engine compartment and then sat in the passenger seat. Henderson took the driver's seat and they started off in search of Cady.

They caught up with Cady on a residential block of "J" Street. Cady was traveling north toward 23rd Street. As Henderson pulled behind Cady, he heard Pettus say, "I should bust on dude." Pettus told Henderson to drive alongside the Jeep. When Henderson did so, Pettus began firing. The first shot hit the Jeep in front of the rear tire. The second shot hit Cady in the left arm and penetrated his chest. Two other shots passed nearby or through the windshield and exited through the plastic rear window.

After the shooting, Cady turned around and headed south toward St. Joseph Hospital, lost control of the vehicle, and crashed into a tree. Although he received medical treatment at the accident scene and at the emergency room, Cady died of the bullet wound.

Police arrested Pettus and charged him with one count of premeditated first degree murder, RCW 9A.32.030(1)(a). At his pretrial hearing, Pettus waived his right to a speedy trial and agreed to a May 6, 1996 trial date. In late March 1996, the State filed a motion to amend the information to include first degree murder committed by extreme indifference to human life, RCW 9A.32.030(1)(b), and to add a second count of unlawful delivery of a controlled substance.

On May 1, the trial court granted the State's motion to amend the information and continued the trial date to July 17, 1996. In late June, the trial court denied Pettus's motions to dismiss the new charges.

At trial, the State offered testimony from witnesses who had been in the vicinity of the shooting. Robert Batie, who was in his house on "J" Street, testified that the gunshots "sounded like a cannon going off." When he looked outside, he saw a Jeep pull a U-turn in the school parking lot across the street from his house. He testified that he saw children who had been playing in the school playground run for cover after the shots were fired.

Carl Grigsby, another "J" Street resident, described seeing Pettus leaning out of the passenger window of the car "shooting backwards." He also observed that the car was going "pretty fast." William Warren also saw the car and

Jeep. He testified that he and his wife thought the car was shooting at their house and that they both fell to the floor when they heard the gunshots. Warren's wife testified that she heard gunshots directly in front of her house and believed that the gunman was firing at her.

Alfred Lawson, a mail carrier, testified that he heard gunshots and saw Cady, bleeding from the neck, driving south on "J" Street toward the hospital. He said that he had seen children playing basketball in the school yard just before the shooting. Frank Hahn, a hospital employee, also testified that he heard the gunshots. He saw Cady crash the Jeep into a tree.

Pettus, testifying in his own defense, admitted that he and Henderson followed Cady after Horton told them that Cady had "ripped them off," that he told Henderson to pull alongside Cady when they caught up with him, and that he reached out of the window and fired his gun at Cady. He denied, however, intentionally shooting Cady or acting with premeditation. Rather, he claimed that he was shooting at the Jeep's tires. But he also admitted being a poor shot and putting persons in the vicinity at risk when he fired the gun.

A jury convicted Pettus as charged. On appeal, Pettus contends that the trial court erred by (1) denying his motion to dismiss the first degree murder charge, (2) misstating the definition of "extreme indifference to human life" in its instructions, (3) refusing to include instructions on the lesser included offenses of second degree murder and first degree manslaughter, and (4) allowing the State to add the delivery charge after the expiration of the original trial date.

## I. Alternative Means of Committing First Degree Murder

The State charged Pettus with committing first degree murder by either of the two following alternative means: (a) acting with the premeditated intent to kill, RCW

9A.32.030(1)(a), or (b) engaging in conduct manifesting an extreme indifference to human life, RCW 9A.32.030(1)(b).

## A. Applicability of Extreme Indifference Alternative

Pettus claims that the extreme indifference to human life alternative is not applicable when the defendant directs his conduct at a single victim. The State responds that under the circumstances here, Pettus put others in the vicinity, as well as his intended victim, at risk of death.

■ RCW 9A.32.030(1)(b) provides that a person is guilty of first degree murder if, "[u]nder circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person." Under this alternative, the State must show that the defendant acted recklessly and with extreme indifference to human life in "general[]," as opposed to simply endangering the life of a "particular" victim or victims. *State v. Berge*, 25 Wn. App. 433, 437, 607 P.2d 1247 (1980). Because the defendant's conduct in *Berge* jeopardized the life of his victim only, the appellate court reversed the conviction. *Berge*, 25 Wn. App. at 437. *See also State v. Anderson*, 94 Wn.2d 176, 616 P.2d 612 (1980) (extreme indifference alternative not applicable where defendant killed child victim by immersing her in overly hot bath because conduct dangerous to victim only).

■ But in this case, in contrast to *Berge* and *Anderson*, the State established that the shooting took place in a residential neighborhood and placed many others in the vicinity at grave risk of death. We find that RCW 9A.32.030(1)(b) applies under these circumstances.

## B. Sufficiency of the Evidence

Pettus next challenges the first degree murder conviction based upon the lack of a unanimity instruction.

■■ In an alternative means case, the jury must be unanimous regarding the defendant's guilt of the crime

charged. *State v. Kitchen*, 110 Wn.2d 403, 410, 756 P.2d 105 (1988). The jury, however, need not be unanimous regarding the alternative means by which the defendant committed the offense if "substantial evidence supports each alternative means." *Kitchen*, 110 Wn.2d at 410. Thus, we must determine, viewing the evidence and all rational inferences therefrom in the light most favorable to the State, whether any rational trier of fact could have found each alternative means of committing the crime beyond a reasonable doubt. *Kitchen*, 110 Wn.2d at 411-12.

## Extreme Indifference

For the reasons discussed above, we find that a juror could conclude beyond a reasonable doubt that Pettus committed first degree murder by extreme indifference. Pettus fired a gun from a moving car numerous times while traveling through a residential neighborhood and near a school. These gunshots placed people in the vicinity at grave risk of death.

## Premeditated, Intentional Murder

The record also contains ample evidence that Pettus committed a premeditated intentional murder. Upon learning that Cady had stolen his drugs, Pettus armed himself with a loaded handgun; he said "I should bust on dude," which means shoot at him; he had Henderson pull the car next to Cady's; he fired the gun four times, hitting Cady in the arm and chest, as well as hitting Cady's vehicle in the driver's side and windshield. A rational trier of fact, viewing this evidence, and all reasonable inferences therefrom, could conclude, beyond a reasonable doubt, that Pettus committed a premeditated and intentional killing.

## II. Extreme Indifference Jury Instruction

Pettus next challenges the jury instruction defining "extreme indifference to human life." This instruction provided:

"Extreme indifference to human life" means indifference to life in general, rather than to any one specific individual. This can be shown by proof of intentional conduct that puts more than one person at risk of death. It may also be shown by intentional conduct that creates a risk of death without being specific as to the identity or position of the person upon whom the risk may fall.

Pettus contends that this instruction suggests that extreme indifference to human life requires proof of intent to kill. He argues that the proper standard should be one of "aggravated" "recklessness," which falls below a specific intent to kill. *State v. Dunbar*, 117 Wn.2d 587, 594, 817 P.2d 1360 (1991).

"Instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury on the applicable law." *State v. McLoyd*, 87 Wn. App. 66, 71, 939 P.2d 1255 (1997). This court presumes that the jury reads the court's instructions as a whole; therefore, we also read and interpret instructions, with certain exceptions, as a whole. *McLoyd*, 87 Wn. App. at 71.

Pettus confuses intent to kill with intent to engage in conduct that creates a risk of death. The instruction requires proof of the latter, not the former. Thus, the instruction did not set forth an improper mental state standard.

Pettus also argues that the instruction was deficient because it required proof only of a "risk" of death, not of a "grave risk." *See* RCW 9A.32.030(1)(b). But the instruction at issue defined only the term "extreme indifference to human life," a mental state that does not necessarily require placing a person in "grave risk" of death. Two other instructions, No. 9 and No. 14, defined the crime and set forth the elements.[1] Both stated that the defendant's

---

[1] Instruction No. 9 provided in pertinent part:

(Alternative B) Murder by Extreme Indifference to Human Life.

conduct must create a *"grave* risk of death." (Emphasis added.) Read as a whole, the instructions properly informed the jury of the applicable law.

### III. Lesser Included Offenses

Next, Pettus argues that the trial court erred by refusing to instruct the jury on first degree manslaughter and second degree murder as lesser included offenses of first degree murder.

■■ The right to present a lesser included offense to the jury is a statutory right. *State v. Bowerman*, 115 Wn.2d 794, 805, 802 P.2d 116 (1990); RCW 10.61.003, .006.[2] A defendant is entitled to a lesser included offense instruction if (1) each element of the lesser offense is a necessary element of the charged offense (the legal test), and (2) the evidence

---

A person commits the crime of murder in the first degree when, under circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person and thereby causes the death of a person.

Instruction No. 14 provided in pertinent part:

To convict the defendant of the crime of Murder in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

. . . .

(Alternative B) Murder by Extreme Indifference to Human Life:

(1) That on or about the 24th day of November, 1995, the defendant shot Donald Cady;

(2) That the conduct of the defendant created a grave risk of death to another person;

(3) That the defendant engaged in that conduct under circumstances manifesting an extreme indifference to human life;

(4) That Donald Cady died as a result of the defendant's acts;

and

(5) That the acts occurred in the State of Washington.

[2]RCW 10.61.003 provides:

Upon an indictment or information for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto, or of an attempt to commit the offense.

supports an inference that the defendant committed the lesser offense (the factual test). *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). Stated differently, if it is possible to commit the greater offense without necessarily committing the lesser offense, a lesser included offense instruction is not required. *State v. Harris*, 121 Wn.2d 317, 320, 849 P.2d 1216 (1993).

RCW 10.61.003 provides the defendant with a statutory right to receive an instruction on a lesser degree offense. A court should give a lesser degree offense instruction, however, only when there is evidence that the defendant committed only the lesser degree offense. *State v. Ieremia*, 78 Wn. App. 746, 754, 899 P.2d 16 (1995).

> It is not sufficient that the jury might simply disbelieve the State's evidence supporting the charged crime. Rather, the evidence must support an inference that the defendant committed the lesser offense instead of the greater one.

*Ieremia*, 78 Wn. App. at 755 (citations omitted).

### A. Second degree murder

Second degree murder, a lesser degree offense of first degree murder, satisfies the legal prong of *Workman*. But Pettus cannot satisfy the factual prong because the record does not contain evidence that he intentionally murdered Cady without premeditation. Rather, the evidence indicates either that Pettus intended to shoot Cady's tires, not to kill him, or that Pettus committed a premeditated murder. Further, having denied committing the lesser degree offense, Pettus was not entitled to the lesser degree offense instruction. *See State v. Charles*, 126 Wn.2d 353, 355-56, 894 P.2d 558 (1995) (holding that lesser degree offense instruction of third degree rape not available because

RCW 10.61.006 provides:

> In all other cases the defendant may be found guilty of an offense the commission of which is necessarily included within that with which he is charged in the indictment or information.

jury would have to disbelieve both defendant's claim of consent and victim's testimony that act was forcible).

## B. First degree manslaughter

Pettus next argues, for the first time on appeal, that the trial court should have instructed the jury on first degree manslaughter as a lesser included offense of first degree murder by extreme indifference to human life. At trial, Pettus initially proposed a first degree manslaughter instruction but later withdrew it after conceding that *State v. Lucky*, 128 Wn.2d 727, 912 P.2d 483 (1996), controlled. Now, citing RAP 1.2, Pettus asks us in the interest of justice to review this issue.[3]

At the time of trial, *Lucky* was the definitive interpretation of the lesser included offense statute. It reaffirmed earlier holdings limiting the use of lesser included offenses to the situation where the alleged lesser offense was a lesser crime of every alternative means of committing the greater offense. *Lucky*, 128 Wn.2d at 732-33. As there are alternative means of committing first degree murder, *Lucky* excluded consideration of manslaughter as a lesser included offense.

But the Supreme Court recently overruled *Lucky* in *State v. Berlin*, 133 Wn.2d 541, 544, 947 P.2d 700, 703 (1997). *Berlin* holds that the court no longer need consider all the alternative statutory means of committing the crime in deciding whether to give a lesser included offense instruc-

---

[3]RAP 1.2 provides, in pertinent part:

   (a) Interpretation. These rules will be liberally interpreted to promote justice and facilitate the decision of cases on the merits. Cases and issues will not be determined on the basis of compliance or noncompliance with these rules except in compelling circumstances where justice demands, subject to the restrictions in rule 18.8(b).

   . . . .

   (c) Waiver. The appellate court may waive or alter the provisions of any of these rules in order to serve the ends of justice, subject to the restrictions in rule 18.8(b) and (c).

tion. *Berlin*, 947 P.2d at 703. It is sufficient that the lesser offense share elements with the charged alternative. Nothing in *Berlin* indicates whether it applies retroactively.

■ We find no error in failing to give a manslaughter instruction. First degree manslaughter requires proof that the defendant (1) recklessly (2) caused the death of another. RCW 9A.32.060(1)(a). First degree murder by extreme indifference to human life requires proof that the defendant acted (1) with extreme indifference, an aggravated form of recklessness, which (2) created a grave risk of death to others and (3) caused the death of a person. RCW 9A.32.030(1)(b); *Dunbar*, 117 Wn.2d at 593. Because the elements of first degree manslaughter are necessarily included in first degree murder by extreme indifference, the legal prong of the *Workman* test is satisfied.

■ ■ But the factual prong is not satisfied because the evidence showed much more than mere reckless conduct—a disregard of a substantial risk of causing a wrongful act. RCW 9A.08.010(1)(c). The evidence showed that Pettus, who admitted that he had poor aim and was unfamiliar with the gun in his hand, used a .357 revolver to fire at least four shots from a moving vehicle while hanging out the car window. Pettus's expert testified that a slug from a .357 magnum could travel a "mile or more" and was capable of penetrating windows and doors. This occurred in the middle of the day in a residential neighborhood near a school playground.

This evidence, if believed, established that Pettus's conduct was extremely indifferent to the lives of people in the vicinity and placed them in great danger. The mere possibility that the jury might disbelieve the State's evidence would not justify giving a manslaughter instruction. The evidence of the force of a .357 magnum, the time of day, the residential neighborhood, and Pettus's admitted inability to control the deadly weapon, particularly from a moving vehicle, does not support an inference that Pettus's conduct presented a substantial risk of some wrongful act instead of a "grave risk of death." Thus, even under the

*Berlin* analysis, Pettus was not entitled to a manslaughter instruction.

### IV. Speedy Trial

Finally, Pettus argues that the speedy trial period had already expired by the time the State sought to amend the complaint to add the delivery charge. *See State v. Peterson*, 90 Wn.2d 423, 431, 585 P.2d 66 (1978) ("the time within which trial must be held should begin on all crimes 'based on the same conduct or arising from the same criminal incident' from the time the defendant is held to answer any charge with respect to that conduct or episode").

■■ Generally, the court may allow amendment of a criminal charge at any time before verdict, provided the amendment does not prejudice the substantial rights of the defendant. CrR 2.1(d); *State v. Pelkey*, 109 Wn.2d 484, 490-91, 745 P.2d 854 (1987). The 60-day speedy trial period for defendants in custody begins to run at arraignment. CrR 3.3(c). But the period of a continuance is excluded from the speedy trial period. CrR 3.3(g)(3); *State v. Raper*, 47 Wn. App. 530, 535, 736 P.2d 680 (1987).

Here, the court granted several continuances. During one of these continuances, the State moved to amend the information to add the delivery charge. As the continuances tolled the running of the speedy trial period, the State added the new charge within the speedy trial period.

Pettus argues that this case is analogous to *State v. Harris*, 130 Wn.2d 35, 44, 921 P.2d 1052 (1996) and *Peterson*, 90 Wn.2d 423. These cases, however, prohibit the State from bringing successive charges based on the same criminal incident over a long period of time. Accordingly, they hold that the speedy trial period for all offenses arising from the same incident begins to run when the State indicts and/or arraigns the defendant on the initial charge or charges. *Harris*, 130 Wn.2d at 44; *Peterson*, 90 Wn.2d at 427. Therefore, any subsequent charges related to the same incident filed after the expiration of the speedy trial period violate the speedy trial rule and must be dismissed.

In *Harris*, for instance, the juvenile defendant pleaded guilty to driving without a valid operator's license. Six months later, the State filed a second set of charges based on the same incident. The Supreme Court overturned the second set of convictions on speedy trial grounds, finding that the juvenile court 60-day speedy trial clock began to run when the defendant was arraigned on the first charge. *Harris*, 130 Wn.2d at 44.

The present case is distinguishable from *Harris* and *Peterson*. The court here granted several continuances. Therefore, Pettus's speedy trial period did not expire before trial commenced. Accordingly, the State did not violate Pettus's speedy trial rights when it amended the complaint to add the delivery charge.

We affirm.

BRIDGEWATER, A.C.J., and HUNT, J., concur.

Review denied at 136 Wn.2d 1010 (1998).