## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71304-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DENNIS RICHARD WATTERS, JR., | ) | |
| | ) | |
| Appellant. | ) | FILED: June 8, 2015 |
| | ) | |

APPELWICK, J. — Watters appeals his conviction for first degree murder by extreme indifference. He argues that the trial court erred in failing to instruct the jury on the lesser included offense of first degree manslaughter. In the alternative, he argues he received ineffective assistance of counsel at trial because his attorney failed to request the instruction. Watters does not establish that he was entitled to a lesser included instruction. His statement of additional grounds lacks merit. We affirm Watters' conviction. However, we remand to the trial court to vacate a separate sentencing order conditionally vacating Watters's conviction for first degree manslaughter.

## FACTS

On July 14, 2012, Ethan Mathers and Ryan Mumm consumed heroin and Xanax and drove to a local Safeway parking lot, a popular hangout, in Mathers's red BMW sedan. At the Safeway, Zachary Smoots offered to sell Mathers and Mumm some marijuana. Mathers took the marijuana without paying for it, and he and Mumm drove away.

Mathers and Mumm drove to Blue Stilly Park in Arlington where they smoked the marijuana. Smoots and several friends, including Brittany Glass and Bo Schemenauer, drove around looking for Mathers and Mumm. Smoots caught up with Mathers and

Mumm after they left the park, and the two groups got out of their cars and fought for a short period. The window of Mathers' car broke during the fight and Mathers cut his hand while throwing the pieces at Smoots' car. According to Mathers, Brittany[1] kicked a dent in his car and threatened him with a metal pipe, so Mathers kicked her. Mathers and Mumm got back into Mathers's car and drove away.

Mathers was upset about his hand and his car, and he and Mumm discussed meeting up with Smoots again to "get somewhat of a fair fight." Mathers called Smoots and the two groups agreed to meet back at the park later that day.

Mathers and Mumm drove to the home where Mumm was temporarily staying with friends, where they used more heroin and gathered weapons, including a croquet mallet and a black metal bar. Mumm also took a Springfield Armory XD9 9mm handgun from the home. Mathers and Mumm recruited three other friends who accompanied them to the park in a separate car.

Brittany called her father, James Glass, and told him she had been assaulted by Mathers. James planned to go to the park and beat up Mathers and Mumm for assaulting Brittany. However, James admitted he was armed with a .357 Taurus revolver that he planned to shoot at a bonfire later that evening. James also called a friend, Dennis Watters, whom he knew had a concealed weapons permit and always carried a gun.

Watters, James, Brittany, Smoots, Schemenauer, and several other friends and family members of the group met up at a Tesoro gas station near the park and waited.

---

[1] Several witnesses in this case share a last name with other witnesses. For the purposes of clarity we refer to those witnesses by their first name.

When the group saw Mathers' BMW enter the park, they followed it. The record reflects that approximately 18 people in at least eight separate cars were at the park for the purpose of the fight.

Mathers testified that he grew impatient waiting for Smoots and had turned around to prepare to leave when the group entered the park. Mumm got out of the passenger seat, fired a warning shot into the air, and got back into the car. As Mumm got into the car, a gold Honda Accord driven by Schemenauer's father Ron "gunned it" into the park and slammed into the front of his BMW. At the same time, Watters pulled up in his Ford Ranger truck so that its passenger side was level with the passenger side of the BMW. Mathers testified that the area that the three vehicles occupied was approximately 30 or 40 feet wide and would have accommodated only two or possibly three vehicles passing at a time. Mathers backed up and "squeezed" between the Honda and the Ranger in order to exit the park. As Mumm leaned forward to put the gun down underneath the seat, Watters pointed a gun directly at the BMW's open passenger side window and fired "two or three times." Mumm was hit in the temple. Mathers drove out of the park and towards an AM/PM gas station. Watters followed Mathers and shot at the BMW as Mathers turned into the AM/PM parking lot.

Watters did not testify. However, Watters gave a recorded statement to law enforcement which was admitted at trial. Watters stated that he owned a 9mm Llama handgun and that he brought it to the park at James's request. When Watters entered the park, the BMW headed towards him until the two cars were "bumper to bumper." Mumm, still inside the car, pulled out a gun and pointed it directly at Watters. Watters

-3-

stated that Mumm fired the gun out of the window and a round hit his side mirror. Mathers backed the BMW up and the BMW passed Watters' truck "rolling by really slow." At that point, Watters stated:

> I grabbed my weapon out, I loaded it, and as they drove by I shot three rounds I believe into his vehicle. I thought I was still hearing shots so I backed up and I turned around and I got on them and stuff and everything. And Jim was in front of me and I was upset that they shot my truck and that they were trying to shoot at me and stuff and everything. And I was trying to get around them so I could stop them. And I don't know what I was going to do but I tried to stop them. Anyways, they wouldn't stop, so I got on them and stuff and I think I rammed the car. And I rammed it into the AM/PM. And I drove off.

Watters reiterated that he fired three shots into the passenger side of the BMW "as quick as I could pull the trigger." When a detective asked, "Where did you think the bullets were going?" Watters responded, "To the passenger." Watters claimed, "I thought I got [Mumm] in the shoulder" and that he had "seen fragments of a body part flying" but did not realize that Mumm had been fatally shot until later. Watters also admitted that he might have shot his own side mirror. He denied shooting at the BMW as it turned into the AM/PM parking lot.

Mumm died as a result of a gunshot wound to the head. A firearms expert from the Washington State Patrol Crime Lab testified that the bullet in Mumm's skull and a bullet recovered from the tire of the BMW came from Watters's gun.

The State charged Watters with first degree murder by extreme indifference (Count I) or, in the alternative, second degree intentional murder (Count II) for the shooting of Mumm in the park. The State also charged Watters with first degree assault of Mathers

(Count III) and first degree assault of Mumm (Count IV) for shooting at the BMW as it entered the AM/PM. The State sought a firearm enhancement on each count.

At trial, Watters sought and received an instruction on justifiable homicide as to Counts I and II. The State and Watters also agreed that the trial court would give lesser included instructions on first degree manslaughter and second degree manslaughter for Count II. Watters did not request, and the trial court did not give, any lesser included instructions for Count I.

The jury convicted Watters as charged on counts I, III and IV and of the lesser included offense of first degree manslaughter on count II. The jury also returned special verdicts that Watters was armed with a firearm on all four counts. The trial court entered a separate order dismissing count II "without prejudice and subject to reinstatement . . . should the Murder in the First Degree conviction be overturned." The trial court sentenced Watters to consecutive standard range sentences totaling 520 months as well as 180 months for the firearm enhancements.

## DECISION

Watters argues that the trial court erred when it failed to instruct the jury on the lesser included offense of first degree manslaughter on Count I. However, the record is clear that Watters did not request a lesser included instruction on Count I.[2] A trial court

---

[2] Watters relies on a discussion between the trial court and the prosecutor following the State's motion to amend the information to charge the alternative offenses of first and second degree murder as separate counts, count I and count II:

THE COURT: In terms of the jury being confused, it appears to me the jury is highly likely to be more confused if it's charged in the alternative than if they're charged separately.

is not obligated to give a lesser included instruction *sua sponte*. State v. Hoffman, 116 Wn.2d 51, 111-12, 804 P.2d 577 (1991). To do so would constitute "an unjustified intrusion into the defense prerogative to determine strategy." State v. Grier, 171 Wn.2d 17, 45, 246 P.3d 1260 (2011).

In the alternative, Watters contends, trial counsel was ineffective for failing to request a lesser included instruction. To establish ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and the performance prejudiced the defendant's case.[3] Strickland v. Washington, 466 U.S. 668, 694, 104 S.

> The jury instructions will be far more complex, frankly, in the alternative than they will be if it's charged separately.
>
> Is manslaughter even a possibility as it relates to Count I as a lesser included?
>
> [PROSECUTOR]: I don't believe so.
>
> THE COURT: But it is as it relates to Count II, isn't it?
>
> [PROSECUTOR]: Yes, I think it is.
>
> THE COURT: At least legally it is. Whether factually it is or not, I don't know. But I don't believe, correct me if you think I'm wrong, but I don't believe that as a legal matter, a lesser included offense of manslaughter is even available for count one, reckless indifference to human life – or not reckless indifference, but extreme indifference to human life. Whereas it is in count two.

Watters argues that in concluding that a lesser included instruction would not have been available on Count I, the trial court was relying on State v. Pettus, 89 Wn. App. 688, 951 P.2d 284 (1998) and State v. Pastrana, 94 Wn. App. 463, 972 P.2d 557 (1999). As our Supreme Court has recently clarified, the analyses in Pettus and Pastrana are no longer valid. State v. Henderson, 182 Wn.2d 734, 743-44, 344 P.3d 1207 (2015). But, Watters did not request a lesser included instruction, and we decline to speculate as to whether the trial court would have refused to give such an instruction if requested.

[3] In support of his claim that he was prejudiced by defense counsel's failure to request a lesser included instruction, Watters relies on Keeble v. United States, 412 U.S.

Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness. State v. Stenson, 132 Wn.2d 668, 705-06, 940 P.2d 1239 (1997). To satisfy the prejudice prong, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "Where the claim of ineffective assistance is based upon counsel's failure to request a particular jury instruction, the defendant must show he was entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." State v. Thompson, 169 Wn. App. 436, 495, 290 P.3d 996 (2012). There is a strong presumption that counsel provided effective assistance. State v. Tilton, 149 Wn.2d 775, 784, 72 P.3d 735 (2003).

Whether a defendant is entitled to a lesser included instruction is analyzed under the two-pronged test outlined in State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). First, each of the elements of the lesser offense must be a necessary element of the charged offense (the "legal prong"). State v. Berlin, 133 Wn.2d 541, 545-46, 947 P.2d 700 (1997). Second, the evidence must raise an inference that *only* the lesser offense was committed to the exclusion of the charged offense (the "factual prong"). State v.

---

205, 212-13, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973), in which the Supreme Court held that "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." However, Keeble "is inapposite in the context of ineffective assistance of counsel." Grier, 171 Wn.2d at 41. This is because "'[i]n making the determination as to whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.'" Id. (alteration in original) (quoting Strickland, 466 U.S. at 694).

Fernandez-Medina, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000). When analyzing the factual prong, we view the evidence in the light most favorable to the party who requested the instruction at trial. Id. at 455-56. However, "the evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt." Id. at 456.

A person is guilty of first degree murder by extreme indifference if he or she, "[u]nder circumstances manifesting an extreme indifference to human life . . . engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person." RCW 9A.32.030(1)(b). A person is guilty of first degree manslaughter when he or she "recklessly causes the death of another person." RCW 9A.32.060(1)(a). A person "acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c). In the context of manslaughter, the "wrongful act" is homicide. State v. Gamble, 154 Wn.2d 457, 467, 114 P.3d 646 (2005). "Although the boundary is not exact . . . RCW 9A.32.030(1)(b) [requires] an aggravated or extreme form of recklessness which sets the crime apart from first degree manslaughter." State v. Dunbar, 117 Wn.2d 587, 594, 817 P.2d 1360 (1991).

Here, parties concede that the legal prong is met, because the elements of first degree manslaughter are necessary elements of first degree murder by extreme indifference. Thus, the only issue is whether the factual prong was met. In other words, Watters must demonstrate that a rational juror could find that his conduct constituted a

knowing disregard of a substantial risk that a homicide could occur, but did not constitute an "extreme indifference" that created a "grave risk" of death. RCW 9A.32.030(1)(b).

Watters does not make this showing. The testimony, even in the light most favorable to Watters, showed that Watters fired three shots from a 9mm handgun directly into the passenger window of the BMW, striking and killing Mumm. The passenger window of Watters' truck was lined up with the passenger window of the BMW, and the two vehicles were so close that Mathers had to drive slowly and "squeeze" by. The likelihood that one of the shots would kill one of the occupants of the BMW was extremely high. This was more than mere reckless conduct. Because Watters does not demonstrate that he would have been entitled to a lesser included instruction, he fails to demonstrate that defense counsel's failure to request one was deficient performance.

Watters's reliance on State v. Henderson, 182 Wn.2d 734, 344 P.3d 1207 (2015) is misplaced. In Henderson, the defendant fired shots from the sidewalk towards a house where a party was being held, killing an individual hired to act as security for the party who was standing near the front of the house. Id. at 739. Police found two bullet holes in the side of the house and others in the sides of cars in the street, but none inside the house, where the majority of the partygoers were. Id. Our Supreme Court concluded that, viewing the evidence in the light most favorable to the defendant, a jury could have rationally concluded that he acted with disregard for a substantial risk of homicide rather than an extreme indifference that caused a grave risk of death because he shot from a substantial distance into a relatively unpopulated area and appeared to be erratically firing his gun rather than aiming to kill. Id. at 746.

Henderson is distinguishable. Here, there is no evidence that Watters was firing indiscriminately. On the contrary, it is uncontroverted that Watters was aiming at the BMW in order to "stop them." Moreover, Watters shot from extremely close range, not a substantial distance like the defendant in Henderson.

Watters further claims the trial court violated double jeopardy when it entered the separate order conditionally vacating Count II. "Double jeopardy prohibits courts from explicitly holding vacated lesser convictions alive for reinstatement should the more serious conviction for the same criminal conduct fail on appeal." State v. Turner, 169 Wn.2d 448, 465, 238 P.3d 461 (2010). The State concedes this was error. We remand to the trial court with instructions to vacate the order.

Watters raises numerous issues in his statement of additional grounds, none of which establish a basis for review.

Watters claims the trial court erred in permitting Mumm's mother to testify and to observe voir dire before testifying. Mumm's mother testified only to the dates of Mumm's birth and death and identified him from a photograph. Given the limited nature of the testimony, Watters does not demonstrate any prejudice.

Watters contends that he was prejudiced when Mathers used the term "murdered" and "executed" and when other witnesses referred to Mathers and Mumm as "kids." Because Watters did not object below and has not established a manifest error affecting a constitutional right, he has waived these claims. RAP 2.5(a).

Watters challenges the credibility of several witnesses. However, credibility determinations are the sole province of the jury and not subject to review. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Watters claims that members of the jury were passing through the courtroom at the time he was being handcuffed and this compromised his presumption of innocence. However, there is no evidence in the record that any jurors saw Watters in handcuffs. Moreover, "[a] jury's brief or inadvertent glimpse of a defendant in restraints inside or outside the courtroom does not necessarily constitute reversible error. Such circumstances are not inherently or presumptively prejudicial and do not rise to the level of a due process violation absent a showing of actual prejudice." In re Pers. Restraint of Davis, 152 Wn.2d 647, 697-98, 101 P.3d 1 (2004). Watters does not demonstrate prejudice.

Watters argues that defense counsel was ineffective for failing to object to various statements as hearsay or speculation and failing to adequately highlight another statement during closing argument. Because statements identified by Watters were of extremely limited relevance, Watters fails to demonstrate deficient performance or resulting prejudice.

Watters claims that a letter written by his father for the purposes of sentencing was disregarded by the trial court. But, the judge stated on the record he had read the letter and Watters' father spoke on Watters' behalf at the sentencing hearing.

Finally, Watters claims that he was denied his constitutional right to counsel at the time of his arrest and that the State improperly edited the statement he made to law

71304-3-I/12

enforcement. These claims appear to rely on facts outside the record and cannot be considered on direct appeal. <u>McFarland</u>, 127 Wn.2d at 337-38.

We affirm Watters' conviction. We remand for the vacation of the order conditionally vacating Count II.

WE CONCUR:

Appelwick, J

Leach, J

Becker, J.

-12-