IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33595-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS ALBERTO ANGUIANO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Luis Anguiano was sentenced to almost 70 years' incarceration

upon conviction for first degree murder with extreme indifference and first degree

assault, with findings that three firearms were used in connection with each crime. On

appeal, he argues that the trial court erred when it (1) admitted prior bad acts evidence,

(2) found sufficient evidence of extreme indifference, (3) imposed multiple firearm

enhancements on each conviction, (4) calculated his offender score without requiring the

State to prove prior convictions, and (5) imposed legal financial obligations (LFOs)

without inquiring into Mr. Anguiano's ability to pay. We decline to address the

unpreserved LFO issue and finding no error or abuse of discretion, affirm.

FACTS AND PROCEDURAL BACKGROUND

On a Saturday morning in January 2014, Charles Burkybile, the caretaker of a

private gun club near Harrah in Yakima County, died after being shot through the door of

his home as he attempted to hold it closed against Luis Anguiano and three others.

Yolauni Hueso, Mr. Burkybile's significant other, who lived with him and their two

young children at the caretaker's residence, would later testify that Mr. Anguiano and the

three others arrived at her and Mr. Burkybile's isolated home unexpectedly, and in a car

they did not recognize. Mr. Burkybile opened the door to speak to the men and she heard

him say, "[T]his is a gun club. We don't do that here," before closing the door and

locking it. He then looked at her and stated, "I don't know who they are. They're just a

bunch of Mexican gangster[s]." Report of Proceedings (RP)[1] at 278.

---

[1] Unless otherwise noted, citations to the report of proceedings are to the April 20, 2015, 1011-page report of trial proceedings.

Ms. Hueso then heard a shot and the family's German shepherd, which had been barking at the men outside, yelped. She heard car doors open, someone running toward the house, and then the sounds of one or more of the men trying to kick in the door. She retreated with the children to a bedroom, where she called 911 and reported that four men in a green car were shooting at the home. The 911 operator told her to stay in the room until the gunfire stopped. When it did, she returned to where her husband had been barring the door and saw him on the ground, their .22 rifle next to him. He was conscious but pointed to his chest, where he had been shot. He died from internal bleeding en route to the hospital.

Seventeen-year-old Carlos Hernandez, the driver of the green car, testified as a witness for the State in the trial below. He told jurors he had agreed to drive his friend Martin Alvarez and brothers Jose Davilla and Luis Anguiano to a place where Mr. Anguiano was going to buy marijuana. He was not familiar with Harrah but followed directions. As they approached the caretaker's home, which Mr. Hernandez described as "in the middle of nowhere," he was alarmed to see his three passengers pulling out handguns. RP at 654-55.

According to Mr. Hernandez, upon arrival, Mr. Anguiano approached the home but Mr. Burkybile stepped outside before he reached the door. He heard Mr. Anguiano ask Mr. Burkybile "if he knew anyone that sold weed" and Mr. Burkybile said no and to "get out of here," and went back in the home, shutting the door. RP at 658. At that point,

3

Mr. Hernandez said Mr. Alvarez got out of the car and shot the dog, which had started barking. Mr. Alvarez and Mr. Anguiano then "tried kicking down the door" but backed up when Mr. Burkybile pointed a rifle out the door and "all the shooting happened." RP at 658-59. Mr. Anguiano, Mr. Alvarez and Mr. Davilla all fired at the home. Mr. Hernandez ducked, at the same time trying to drive away, and Mr. Anguiano, Mr. Alvarez and Mr. Davilla retreated into Mr. Hernandez's car. Ms. Hueso later estimated that she heard as many as 14 or 15 shots fired and that the shooting toward the house continued as the men drove away. Mr. Hernandez testified that Mr. Anguiano fired his entire clip and that Mr. Alvarez and Mr. Davilla each fired six or seven shots. He agreed that even as he drove away, his passengers continued shooting.

Officer Raymond Enriquez was driving toward the gun club in response to Ms. Hueso's 911 call when he saw a green car with Hispanic passengers that met her description of the shooters. He turned and followed it. Mr. Hernandez was encouraged by his passengers to "step on it," and attempted to elude the officer but eventually hit a curb and crashed. RP at 662. Officer Enriquez saw four men flee the scene of the accident.

Mr. Davilla was later found in the vicinity and on the Monday following the Saturday shooting, Mr. Hernandez appeared at the Yakima County Sheriff's Department with a lawyer and turned himself in. He told a detective what had happened and led detectives to the area where his passengers had thrown their handguns from the car

4

during the chase. Officers found two of the firearms. Mr. Hernandez was referred to juvenile court, agreed to testify against Mr. Anguiano and Mr. Alvarez, and was charged with eluding the police and criminal assistance.

The State ultimately charged Mr. Anguiano with two alternative counts of first degree murder (committed in furtherance of a felony, and by extreme indifference), second degree felony murder, the first degree assault of both Mr. Burkybile and Ms. Hueso, and attempted first degree burglary.[2] The State asserted that each crime was committed while armed with three firearms.

Mr. Anguiano's version of events was that he had purchased marijuana from Mr. Burkybile many times in the past and traveled to the gun club for the sole purpose of buying marijuana. After Mr. Burkybile closed the door on him, he claimed to have kicked it only three times, out of anger at Mr. Burkybile's abrupt treatment. He claimed he shot his gun only in self-defense after Mr. Burkybile fired his rifle at the men from inside the home.

Before trial, there was discussion of the fact that the State wanted to offer evidence suggesting that Mr. Anguiano had been involved in a burglary of the Burkybile/Hueso home two weeks before the shooting, as a result of which he knew that there was a large amount of marijuana and cash there. Ms. Hueso had a prescription for

---

[2] One count of first degree unlawful possession of a firearm was also charged, but was dismissed.

5

marijuana and it was undisputed that the couple maintained a supply large enough for her use and to sell to friends. It was the State's theory that knowing this, Mr. Anguiano had returned with his armed companions to steal drugs and money. The evidence and theory came up in a pretrial hearing, when motions in limine were being reviewed and defense counsel stated that for "[a]ny 404(b) evidence that the [S]tate intends to elicit, I'd like to have the opportunity to voir dire whatever witness they're trying to get it in through and object outside the presence of the jury." RP at 17.

On the second day of trial the matter of the prior burglary-related evidence was raised again, outside the presence of the jury. This time, the trial court stated it would allow the State to offer the evidence to show the motivation for the crimes charged. Over defense counsel's objection, it allowed the State to present evidence that when apprehended, Mr. Anguiano had two items in his possession that Ms. Hueso testified had been stolen from her home two weeks earlier: a cannabis jar labeled "Girl Scout Cookies"[3] and a box of Hornady Lever Revolution 30-30 Winchester 160-grain ammunition that she claimed to have purchased at a Bi-Mart store shortly before Christmas 2013.

---

[3] Evidently a popular, high potency strain of marijuana. *See Girl Scout Cookies*, ALLBUD, https://www.allbud.com/marijuana-strains/hybrid/girl-scout-cookies [https://perma.cc/LAP5-DSYE].

Also over defense counsel's objection, the trial court admitted as a business record a retail receipt showing a purchase from Bi-Mart of two boxes of the Hornady 30-30 ammunition on December 23, 2013—several weeks before the first burglary. The Universal Product Code (UPC) on the receipt confirmed that the ammunition found in Mr. Anguiano's bag was the same type as that purchased from Bi-Mart in December, although it did not prove that the box found in Mr. Anguiano's possession was the box stolen from the Burkybile/Hueso home.

The jury found Mr. Anguiano guilty on all counts, found by special verdict that the murder of Mr. Burkybile occurred during an attempted first degree robbery and under circumstances manifesting extreme indifference to human life, and found that Mr. Anguiano and his accomplices had been armed with three firearms in connection with each count.

The trial court ruled that the second degree murder, first degree assault on Mr. Burkybile, and attempted burglary counts merged into the first degree murder count. In sentencing Mr. Anguiano for the two convictions that remained, it calculated his offender score as two for the murder conviction and imposed a base sentence of 347 months, with an additional 180 months in firearm enhancements. It calculated the offender score as zero for the first degree assault conviction and imposed a base sentence of 123 months, with another 180 months in firearm enhancements. With the sentences on both counts and the firearm enhancements running consecutively, the total term of confinement

imposed was 830 months. The court found Mr. Anguiano able to pay costs and imposed

$1,400 in legal financial obligations. Mr. Anguiano did not object.

Mr. Anguiano appeals.

## ANALYSIS

### *Evidentiary rulings*

Mr. Anguiano assigns error to two of the trial court's evidentiary rulings. We first

address his contention that the court admitted evidence that he had burglarized the

Birkybile/Hueso home a couple of weeks before Mr. Birkybile was killed, without

complying with the procedure required before admitting evidence under ER 404(b).

ER 404(b) prohibits the use of "[e]vidence of other crimes, wrongs, or acts . . . to

prove the character of a person in order to show action in conformity therewith." The

same evidence may "be admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

accident," however. ER 404(b).

The proponent of prior bad act evidence bears the burden of establishing that the

act is offered for a proper purpose. *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207

(2012). Before a trial court can admit the evidence, it must "'(1) find by a

preponderance of the evidence that the misconduct occurred, (2) identify the purpose for

which the evidence is sought to be introduced, (3) determine whether the evidence is

relevant to prove an element of the crime charged, and (4) weigh the probative value

8

against the prejudicial effect.'" *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

Appellate courts "review the trial court's interpretation of ER 404(b) de novo as a matter of law." *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). Where the trial court correctly interprets the rule, its decision to admit evidence of misconduct is reviewed for abuse of discretion. *Id.* "A trial court abuses its discretion where it fails to abide by the rule's requirements." *Id.*

The State incorrectly asserts that Mr. Anguiano did not object to the evidence on ER 404(b) grounds. He identified ER 404(b) as a basis for his objection twice, and the court ruled outside the presence of the jury that it would admit the evidence on the issue of motive. Mr. Anguiano is deemed to have a standing objection. *State v. Powell*, 126 Wn.2d 244, 256, 893 P.2d 615 (1995).

In most cases involving evidence of prior bad acts, the proponent offers equally strong evidence that (1) the bad act occurred and (2) the person against whom the evidence is offered did it. But ER 404(b) can also apply to cases such as this one where the stronger evidence is that the bad act occurred, but the identity of who did it is less clear. *State v. Norlin* is one such case—a prosecution for assault of an infant, in which the State offered medical evidence that the infant had suffered earlier, intentionally inflicted injuries but there was no direct evidence that the defendant, Norlin, inflicted them. 134 Wn.2d 570, 951 P.3d 1131 (1998). In such a case, our Supreme Court held,

9

the bad acts evidence was admissible to show absence of accident pursuant to ER 404(b) "only if the State connects the defendant to the prior injuries by a preponderance of the evidence." *Id.* at 581. Similarly here, the State had the burden of showing that the prior burglary occurred connecting Mr. Anguiano to it by a preponderance of the evidence.

A trial court may determine that the State has met its burden of showing the prior misconduct occurred "based solely on the State's offer of proof." *State v. Stein*, 140 Wn. App. 43, 66, 165 P.3d 16 (2007) (citing *State v. Kilgore*, 147 Wn.2d 288, 295, 53 P.3d 974 (2002), *aff'd*, 167 Wn.2d 28, 216 P.3d 393 (2009)). "[W]here a trial court rules on the admissibility of ER 404(b) evidence immediately after both parties have argued the matter and the court clearly agrees with one side, an appellate court can excuse the trial court's lack of explicit findings." *Stein*, 140 Wn. App. at 66 (citing *State v. Pirtle*, 127 Wn.2d 628, 650, 904 P.2d 245 (1995)).

Mr. Anguiano is correct that the trial court made no explicit finding that the State established the prior burglary occurred and connected him to it by a preponderance of the evidence. However, the trial court found the evidence was admissible immediately after the State's offer of proof that when arrested, Mr. Anguiano had in his possession the Girl Scout Cookies cannabis jar and the box of 30-30 Hornady bullets that Ms. Hueso would identify as stolen from her home only two weeks before. We can excuse the lack of explicit findings.

Mr. Anguiano argues that both the Girl Scout Cookies cannabis and the Hornady bullets are commercially sold and cannot be established as the same items stolen from the Burkybile/Hueso home. But in *Norlin*, the State could only prove that the defendant babysat the injured infant between 40 and 70 hours a week (of the 168 total hours in a week) during the period the earlier injuries occurred, and that the infant's mother had seen evidence of injuries from other "accidents" reported by the defendant when the child was in his care. 134 Wn.2d at 583. Although the evidence could "only be described as circumstantial, it was sufficient to connect Norlin to [the] injuries by a preponderance of the evidence." *Id.* Here, we are not presented with evidence of items in Mr. Anguiano's possession so common that they would be found in the possession of many people. Ms. Hueso testified that the Girl Scout Cookies cannabis was a type she had purchased only from a small dispensary in Seattle. The items were sufficiently unusual that evidence Mr. Anguiano possessed them was circumstantial evidence connecting him to the prior burglary by a preponderance of the evidence.

The trial court also did not weigh the probative value of the evidence against the risk of unfair prejudice, but the record is sufficient to permit meaningful review of this basis for exclusion under ER 403. *See State v. Barragan*, 102 Wn. App. 754, 759, 9 P.3d 942 (2000); *State v. Donald*, 68 Wn. App. 543, 547, 844 P.2d 447 (1993); 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 404.32 (6th ed. 2016) (noting that some courts require the trial court to balance probative and prejudicial

11

effect on the record, but others do not insist on strict compliance and have even performed the balancing for the first time on appeal); *State v. Hepton*, 113 Wn. App. 673, 688, 54 P.3d 233 (2002) ("When the trial court identifies the purpose for which the evidence is believed to be relevant, the reviewing court can determine whether the probative value of the evidence outweighs its prejudicial effect.").

Mr. Anguiano argues that admission of the evidence of the earlier burglary unfairly prejudiced him by undermining his credibility, particularly because the prior act was similar to the charged crime. Reply Br. at 6. While this may be true, the State did not rely on the evidence of the earlier burglary to argue to the jury that Mr. Anguiano was a criminal type or a burglar—it relied on the evidence for the purpose identified to the court: to explain that Mr. Anguiano traveled with the others to the remote gun club not to buy marijuana, but because he was aware from the earlier burglary of drugs and cash likely to be found in the caretaker's home.

The evidence is highly probative. Absent some prior knowledge of the home, why would Mr. Anguiano have traveled so far, and enlisted others, to burglarize it? Absent evidence that Mr. Anguiano knew that there was ample marijuana and cash to be found in the Burkybile/Hueso home, Mr. Anguiano could easily have argued to jurors that a plan

12

to travel all the way to Harrah to attempt a burglary or home invasion robbery in broad daylight made no sense.[4]

We would also find any error to be harmless. There was overwhelming untainted evidence against Mr. Anguiano in the form of Ms. Hueso's and Mr. Hernandez's consistent testimony; the evidence of Mr. Anguiano's and his accomplices' flight; and the implausibility of his testimony that the shootout was prompted by his three frustrated kicks to the door, Mr. Burkybile's overreaction, and the regrettable coincidence that he, his brother, and Mr. Alvarez all brought handguns to the marijuana buy. We are satisfied that the result of the trial would have been the same had the trial court sustained Mr. Anguiano's ER 404(b) objection.

Mr. Anguiano also contends the court erred when it admitted as a business record a retail receipt reflecting a purchase from Bi-Mart on December 23, 2015, of a box of ammunition identical to that found in Mr. Anguiano's possession at the time of his arrest. Hearsay, such as a store receipt offered to prove that a purchase occurred, is inadmissible under ER 802 unless it falls within an exception. The Uniform Business Records as

---

[4] The State also contends that the earlier burglary helps explain Mr. Burkybile's hypervigilant behavior on the day he was killed. But for that purpose, only evidence that the burglary had occurred would be needed; there would have been no need to offer evidence that Mr. Anguiano was connected with it.

Evidence Act (UBRA), chapter 5.45.020 RCW,[5] provides such an exception for business records because they "are presumptively reliable if made in the regular course of business and there was no apparent motive to falsify." *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990). A trial court's decision "in admitting or excluding such records is given much weight and will not be reversed unless there has been a manifest abuse of discretion." *Cantrill v. Am. Mail Line*, 42 Wn.2d 590, 608, 257 P.2d 179 (1953).

The State offered the exhibit through Brian Schroeder, who was manager of the Sunnyside Bi-Mart store at the time of trial but had not been the manager in December 2013. He testified that such receipts are kept in the regular course of business:

> Q. . . . is this document, state's Identification 216, an accurate document kept in the normal course of business by the Bi-Mart Corporation?
> A. On a computer it is. On paper, no.

RP at 726. Though he never testified that such receipts are created at or near the time of a transaction, his testimony establishes that they are:

> A. . . . [I]s this something that you keep similar records in your store?
> Q. My store, no.
> A. Okay. And what kind of records do you normally keep? Do you keep sales entrances?

---

[5] RCW 5.45.020 provides:

A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

14

Q. We keep sales transactions of the current day, the previous day. Other transactions are kept in Eugene.

RP at 718. Records of a current day's transactions could not be kept at the store if they were not made on the day of the transaction.

Mr. Anguiano challenges whether Mr. Schroeder was a "custodian" or "other qualified witness," because at the time of trial he had only worked at the store for three months, receipts were kept on a hard drive at a store in a different city, and he did not personally procure the receipt nor verify its contents with company records. Under the business records statute, however, reviewing courts broadly interpret the statutory terms "custodian" and "other qualified witness." *State v. Smith*, 55 Wn.2d 482, 348 P.2d 417 (1960); *State v. Ben-Neth*, 34 Wn. App. 600, 603, 663 P.2d 156 (1983); *State v. Quincy*, 122 Wn. App. 395, 399, 95 P.3d 353 (2004). The statute does not require the person who created the record to identify it as long as one who has custody of the record as a regular part of his work can do so. *Cantrill*, 42 Wn.2d 590; *Ben-Neth*, 34 Wn. App. at 603; *Quincy*, 122 Wn. App. at 399. "Identification by a custodian may be sufficient even though the custodian was hired after the record was made." 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.41, at 111 (6th ed. 2016) (citing *Cantrill*, 42 Wn.2d 590). Admissibility hinges on the opinion of the court that the sources of information, method, and time of preparation were such as to justify its

15

admission. *Quincy*, 122 Wn. App. at 401; *Ben-Neth*, 34 Wn. App. at 603. Computerized

records are treated the same as any other business records. *Quincy*, 122 Wn. App. at 399.

The store manager testified that he was the custodian of records, despite the fact

that records over two days old are kept electronically in a different city:

> THE COURT: . . . Are you the custodian of that record . . . ? The person
> who's in charge of it, is that you or somebody in Eugene?
> THE WITNESS: I would believe me.
> THE COURT: Okay. So you have access to those records at your store?
> THE WITNESS: Yes, sir.
> THE COURT: And you're in charge of them?
> THE WITNESS: Yes, sir.
> THE COURT: But they're not kept at your store?
> THE WITNESS: They're not. They're kept in Eugene.

RP at 721. The manager further testified that he had received the receipt from Bi-Mart's

corporate office, and that he assumed the previous store manager had accessed and

printed it, though he could not be sure. The statute does not require more. The trial court

clearly found the evidence sufficiently reliable.

And here again, any error in admitting the receipt was harmless. Because any

error was evidentiary in nature, this court applies "the rule that error is not prejudicial

unless, within reasonable probabilities, the outcome of the trial would have been

materially affected had the error not occurred." *State v. Tharp*, 96 Wn.2d 591, 599, 637

P.2d 961 (1981). Although it was established outside the presence of the jury that Mr.

Schroeder was able to tie the receipt to a cash purchase by Ms. Hueso because she had

purchased a firearm and completed a federal firearm document the same day, the trial

16

court excluded testimony about that tie-in because of the State's late receipt and disclosure of the firearm form. As a result, the Bi-Mart receipt was only evidence that *someone* purchased a box of the ammunition on the day in question. As such, it was cumulative to, and less important than, Ms. Hueso's testimony identifying the ammunition found in Mr. Anguiano's possession as ammunition she had purchased at Bi-Mart right before Christmas in December 2013.

### Evidence sufficiency

Mr. Anguiano next contends that insufficient evidence supports his conviction for first degree murder manifesting extreme indifference as provided by RCW 9A.32.030(1)(b). The statute provides that a person is guilty of murder in the first degree when "[u]nder circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person."

To prove that the defendant acted with extreme indifference, "the State must show that the defendant acted recklessly and with extreme indifference to human life in 'general[ ],' as opposed to simply endangering the life of a 'particular' victim or victims." *State v. Pettus*, 89 Wn. App. 688, 694, 951 P.2d 284 (1998) (alteration in original) (quoting *State v. Berge*, 25 Wn. App. 433, 437, 607 P.2d 1247 (1980)), *abrogated in part on other grounds by State v. Gamble*, 154 Wn.2d 457, 114 P.3d 646 (2005). For example, where a defendant fired 30 shots into and around the victim, who was sleeping

17

in the defendant's living room, the court found insufficient evidence of extreme indifference because the "attack was specifically directed at a particular victim." *Berge,* 25 Wn. App. at 437 (emphasis omitted). Similarly, there was no extreme indifference where a defendant placed a toddler into a bath of scalding hot water from which she eventually died because the indifference was directed only toward the murdered individual. *State v. Anderson,* 94 Wn.2d 176, 178-79, 186, 192, 616 P.2d 612 (1980). Mr. Anguiano argues that his conduct, and that of his accessories, was similar: they shot specifically at Mr. Burkybile, did not know or see anyone else in the area, and the shooting occurred in a rural area.

"'The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Witherspoon,* 180 Wn.2d 875, 883, 329 P.3d 888 (2014) (quoting *State v. Salinas,* 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). A criminal defendant's claim of insufficient evidence admits the truth of the State's evidence and "'all inferences that reasonably can be drawn [from it].'" *State v. Condon,* 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (alteration in original) (quoting *Salinas,* 119 Wn.2d at 201).

The *Anderson* and *Berge* decisions have been distinguished by later cases "because in each *only* the life of the victim was endangered." *State v. Pastrana,* 94 Wn. App. 463, 473, 972 P.2d 557 (1999) (emphasis added), *abrogated in part on other*

18

*grounds by State v. Gamble*, 154 Wn.2d 457, 114 P.3d 646 (2005). In *Anderson*, no one else was conceivably endangered by the defendant's actions in bathing the toddler. In *Berge*, because the shooting took place in the defendant's home and was held by the court to be "specifically directed at a particular victim," it can again be inferred that no one else was conceivably endangered. 25 Wn. App. at 437 (emphasis omitted).

Conversely, a defendant's claim following a road rage incident that he was "unaware that anyone other than the driver [of an offending vehicle] was in the 'line of fire'" did not take his crime outside of the operation of RCW 9A.32.030(1)(b). *Pastrana*, 94 Wn. App. at 471. And in *State v. Pettus*, the court distinguished *Berge* and *Anderson* on the basis that the defendant's shooting *in fact* placed others in the vicinity at grave risk of death, not that he "knowingly" did so. 89 Wn. App. at 694.[6]

There was no evidence that Mr. Anguiano had a basis for believing that only Mr. Burkybile was in the home. Ms. Hueso testified that her car and Mr. Burkybile's truck

---

[6] Mr. Anguiano claims *Pastrana* and *Pettus* were called into question and arguably lacked a full understanding of the elements of murder by extreme indifference. Reply Br. at 8. However, the portions of *Pastrana* and *Pettus* that have been abrogated relate to the definition of "reckless," which has since been narrowed. *See Gamble*, 154 Wn.2d at 469 (concluding that first degree manslaughter is not a lesser included offense of second degree felony murder where the predicate felony is second degree assault); *State v. Henderson*, 182 Wn.2d 734, 741-42, 344 P.3d 1207 (2015) (noting that *Pastrana* and *Pettus* applied a general definition of "reckless" when deciding whether first degree manslaughter was a lesser included offense of first degree murder by extreme indifference and that the definition was later narrowed in *Gamble*, 154 Wn.2d 457). There is no indication that either case misunderstood or misapplied the standards of murder by extreme indifference.

19

were both at the home that day. Between Mr. Anguiano, Mr. Alvarez, and Mr. Davilla, they fired at least 18 shots. An officer testified to four bullet holes in the door on the east side of the home, another six bullet holes on other portions of the east side of the home, and more than one bullet hole on the south side of the home. Officers found bullet strikes in the interior of the home as well, in the laundry room, kitchen, and in the closet and wall of a back bedroom. Mr. Anguiano and his companions clearly did not limit their fire to the doorway from which Mr. Burkybile fired. Their actions created a grave risk of death, in fact, to all four individuals in the home.

Viewed in the light most favorable to the State, this is sufficient evidence for the jury to have found Mr. Anguiano acted with extreme indifference toward human life in general.

### Double jeopardy

Mr. Anguiano next argues that the trial court violated principles of double jeopardy when it imposed three firearm enhancements on each of his two convictions. "The Washington Supreme Court specifically addressed this argument in *State v. DeSantiago*, 149 Wn.2d 402, 415-21, 68 P.3d 1065 (2003), holding 'the plain language of [RCW 9.94A.533[7]] requires a sentencing judge to impose an enhancement for each firearm or other deadly weapon that a jury finds was carried during an offense.'" *State v.*

---

[7] The *DeSantiago* court analyzed RCW 9.94A.510. The language at issue there has now been recodified in RCW 9.94A.533.

*Mancilla*, 197 Wn. App. 631, 652, 391 P.3d 507 (2017) (emphasis omitted) (alteration in original); *see also State v. Ose*, 156 Wn.2d 140, 147, 124 P.3d 635 (2005) (noting the statute allows a defendant to be punished for each weapon involved). While Mr. Anguiano argues that the holding in *DeSantiago* was dicta and "rests on a precarious foundation," Br. of Appellant at 24, he will have to make that argument to the Supreme Court. We regard *DeSantiago* as binding authority. *Mancilla*, 197 Wn. App. at 652.

### *Offender score*

At sentencing, the State asserted Mr. Anguiano had two prior felony offenses for delivery of controlled substances. Mr. Anguiano contends the State failed to prove the existence of the two convictions, resulting in a miscalculated offender score.

In order to establish a defendant's criminal history for sentencing purposes, the State must prove a defendant's prior convictions by a preponderance of the evidence. *State v. Mendoza*, 165 Wn.2d 913, 920, 205 P.3d 113 (2009). The best evidence of a prior conviction is a certified copy of the judgment, but the State may offer other comparable documents of record or transcripts of prior proceedings to establish criminal history. *In re Adolph*, 170 Wn.2d 556, 566, 243 P.3d 540 (2010) (citing *State v. Ford*, 137 Wn.2d 472, 480, 973 P.2d 452 (1999)). "[The] burden is 'not overly difficult to meet' and may be satisfied by evidence that bears some 'minimum indicia of reliability.'" *Id.* at 569 (quoting *Ford*, 137 Wn.2d at 480-81).

21

The need for the State to produce evidence is obviated where there is "an *affirmative* acknowledgment by the defendant of *facts and information* introduced for the purposes of sentencing." *Mendoza*, 165 Wn.2d at 928. "The mere failure to object to a prosecutor's assertions of criminal history does not constitute such an acknowledgment." *Id.*

The parties dispute whether defense counsel, in arguing for a downward departure from the standard range, affirmatively acknowledged the criminal history information offered by the State. Mr. Anguiano emphasizes his lawyer's cautionary reference to "the State's calculation," while the State emphasizes the lawyer's reference to his client's "non-violent criminal history of two points":

> [DEFENSE COUNSEL:] When we—you know, *by the State's calculation,* we end up with—you know, a top end of a range that's 497 months . . . . And then 648 months in firearm enhancements. I think that this is a situation that the legislature simply hasn't dealt with yet with regards to what kind of merger doctrines we potentially should have when—when you're talking about multiple co-defendants, accomplice liability with regards to the firearm enhancements, and how to—to deal with that because, you know, *we start* with a base range on the First Degree Murder with—*with his non-violent criminal history of two points,* at 281 to 374, and then we jump—you know, we double that just in enhancements alone because of the multiple offenses. And . . . even though it's—it's really one event, we end up with consecutive, consecutive, consecutive sentences, consecutive enhancements. So, I don't think the Court has any discretion with regards to the enhancements at this point in time. I think the only discretion the Court has is with regards to the permissiveness of the anti-burglary statute as well as, you know, a potential downward departure to get him down to something that I think would be a—a fair and just sentence. I—I would ask the Court to consider that.

RP (Oct. 23, 2014) at 341-42 (emphasis added).

The State has the better argument. Counsel's unqualified reference to his client's "non-violent criminal history of two points" is a sufficient, affirmative acknowledgment.

### *LFOs*

Finally, Mr. Anguiano argues the trial court did not adequately consider his current and likely future ability to pay LFOs and asks that we remand for the trial court to conduct the proper inquiry.

Mr. Anguiano made no objection to the finding that he had the present or future ability to pay the costs imposed and thereby failed to preserve a claim of error. RAP 2.5(a); *State v. Blazina*, 182 Wn.2d 827, 833, 344 P.3d 680 (2015) ("[u]npreserved LFO errors do not command review as a matter of right"). "[A] defendant has the obligation to properly preserve a claim of error" and "appellate courts normally decline to review issues raised for the first time on appeal." *Id.* at 830, 834. The rationale for refusing to review an issue raised for the first time on appeal is well settled—issue preservation helps promote judicial economy by ensuring "that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *State v. Robinson*, 171 Wn.2d 292, 304-05, 253 P.3d 84 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)). A majority of the panel declines to exercise discretion to review the issue for the first time on appeal.

23

No. 33595-0-III
*State v. Anguiano*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, C.J.

24