# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54288-9-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| MICHAEL EARL MILLER, | |
| Appellant. | |

MAXA, P.J. – Michael Miller appeals his convictions of two counts of second degree assault with firearm enhancements. The convictions arose from an incident in which Miller and another man had an altercation on Miller's front porch, which was attached to his mobile home. After Miller went inside and the man walked back to his vehicle, Miller re-emerged onto his porch and shot a gun several times in the direction of the man and others. Miller claimed self-defense.

We hold that the trial court did not err in (1) instructing the jury that Miller could defend himself only if he reasonably believed that he was about to suffer "great personal injury," because he used deadly force; (2) declining to give a lesser included offense instruction on unlawful display of a firearm because Miller fired the gun from his "place of abode" and therefore could not be guilty of that offense under RCW 9.41.270(3)(a); and (3) denying Miller's

request to appoint new defense counsel. Accordingly, we affirm Miller's second degree assault convictions.

FACTS

*Background*

Miller was a 65-year-old man who lived in a mobile home with a small attached front porch. The porch was accessed by steps that were adjacent to the side of the mobile home and by a ramp without railings at the end of the porch. The porch area extended five or six feet out from the front door and was about the width of the door. A section of the porch was not structurally sound.

Steve Aitchison was a 56-year-old man who was six foot three inches tall and weighed approximately 360 pounds. He lived in the same mobile home park as Miller. Aitchison's daughter, Jessica Aitchison, also lived in the mobile home park. Aitchison was the president of the park's homeowners association. It was common knowledge among Aitchison's neighbors, including Miller, that Aitchison had a concealed carry permit and normally was armed.

Vernon Frye lived in a mobile home located near Miller's mobile home. Frye was vice president of the homeowner's association and friends with Aitchison. Jourdan Brown was Miller's next-door neighbor.

*The Incident*

In September 2018, Jessica[1] entered a mobile home near Miller's mobile home to clean and to remove all the previous resident's belongings. Miller arrived at the mobile home and told

---

[1] This opinion refers to Jessica Aitchison by her first name to distinguish her from her father. No disrespect is intended.

her that she was not allowed to be there. Jessica informed Miller that he should talk to her father about any further questions regarding her presence.

After Jessica finished cleaning, she recounted her interaction with Miller to Aitchison. Frye also was present. Aitchison and Frye decided that they would drive over to Miller's home and inform him that Jessica had been authorized to enter and work on the mobile home.

Aitchison parked his truck in front of Miller's home, approximately 20 to 25 feet away from Miller's front porch. Aitchison walked up to the porch and knocked on Miller's door while Frye stood a foot or two in front of Aitchison's truck. Miller looked outside and saw Aitchison's truck, then opened the door and saw Aitchison standing on his front porch.

Using expletives, Miller told Aitchison to get off his porch and off his property. Miller attempted to escort Aitchison off his porch and an altercation began. The men grabbed each other, and one of Aitchison's legs and one of Miller's legs went through the floor of the porch and Aitchison landed on top of Miller. Miller injured his shoulder during the altercation. Aitchison did not pull out a gun at any point during the altercation.

Brown heard the altercation. He walked over to Miller's mobile home and told Aitchison to get off Miller and to call the police. Aitchison got up and let go of Miller. Miller struggled to get up because he could not use his right arm, but he walked back into his home. Aitchison walked to his truck to retrieve his phone as Frye continued to stand near the truck.

While Miller was inside, he grabbed a loaded .44 Magnum revolver. Miller walked back outside and saw Aitchison and Frye standing outside Aitchison's truck. Miller raised the gun and began firing in the direction of the truck. Aitchison, Frye, and Brown all ran away and none were hit. Miller fired a total of four shots, with one shot that misfired. One of the bullets hit the truck.

3

The police arrived and eventually took Miller into custody. The State charged Miller with three counts of first degree assault, each with a firearm enhancement.

*Requests for a New Attorney*

During a trial readiness hearing on May 3, 2019, Miller informed the court that he would like a new attorney appointed to represent him. There were two court-appointed attorneys assigned to Miller's case. Miller stated that he did not get along with one of the attorneys and believed that his attorney was trying to force him to take the plea deal from the State rather than go to trial. Miller also stated that he was concerned that defense counsel was not prioritizing his case. The trial court denied his request after explaining that his concerns did not justify discharging his counsel.

At a hearing on September 20, Miller again asked for a new attorney. Miller stated that "there's been nothing but conflict between me and myself and my current counsel" and that his attorney had not received any discovery from the State to start preparing for his defense. 6 Report of Proceedings (RP) at 42. Miller also explained that "[a]t every single meeting with counsel to date, I have had to try to defend my innocence to counsel like he is the jury of my peers." 6 RP at 42.

In response, defense counsel stated that Miller had seen all the discovery during their meetings in jail within the presence of his investigator and that he was unsure whether Miller was upset with himself or with his co-counsel. He conceded that his conversations with Miller had been difficult, in part because Miller did not like his legal advice. Defense counsel explained that he advised Miller to accept the State's plea offer because the alternative could lead to a conviction, and Miller would spend the rest of his life in prison.

The trial court denied Miller's request for new counsel, explaining that there was no basis for discharging either of his attorneys because they did not have an ethical conflict in representing him.

*Jury Trial*

At trial, Aitchison, Jessica, Frye, and Brown all testified to the events described above. Miller also testified on his own behalf.

Miller claimed that he was acting in self-defense. He was concerned with the fact that Aitchison and Frye, who outnumbered him and outweighed him, were still talking outside. He heard the truck door slam, and he thought that Aitchison was getting a gun. He believed that he would be in trouble if they came back toward him. He wanted them out of the area.

Miller testified that he held his gun in a low position with both hands and attempted to bring his gun upwards to shoot it into the air, but he felt a shooting pain and was unable to bring his arm fully up. He testified that the pain in his arm caused him to accidentally fire the first shot. Miller proceeded to fire off two more shots and was unaware of a misfired round.

According to Miller, he only intended to discharge his gun into the air to run Aitchison and Frye off his property and to cause them apprehension. He testified that he fired more than one shot because Aitchison and Frye had stopped running after the first shot but did not leave his line of vision. Miller feared that Aitchison and Frye might return to his property.

The trial court determined that Miller was entitled to a self-defense instruction and stated that it planned to give three related instructions on self-defense. The State did not object to giving self-defense instructions. Instruction 23 stated:

> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to suffer *great personal injury* in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.

5

Clerk's Papers (CP) at 52 (emphasis added). Instruction 26 stated: "A person is entitled to act on appearances in defending himself, if that person believes in good faith and on reasonable grounds that he is in actual danger of *great personal injury*." CP at 55 (emphasis added). Instruction 27 defined "great personal injury as "severe pain and suffering." CP at 56.

Miller objected to the use of "great personal injury" instead of "be injured" as the standard of law for self-defense in Instruction 26. The trial court ruled that because Miller used deadly force in self-defense, "great personal injury" was the correct standard of law. After a discussion regarding instruction 23, the trial court replaced "be injured" with "suffer great personal injury" in that instruction too. 5 RP at 784-85.

The trial court gave an inferior degree offense instruction on second degree assault. Miller also requested an instruction on the lesser included offense of unlawful display of a weapon. Although the court found that the general requirements for a lesser included offense instruction were satisfied, it ruled that Miller could not be guilty of unlawful display of a weapon on his porch under RCW 9.41.270(3)(a). That subsection states that the offense of unlawful display of a firearm cannot be committed by a person while in his "place of abode." RCW 9.41.270(3)(a). The court determined that Miller's front porch was part of his abode.

The jury acquitted Miller of all three counts of first degree assault and one count of second degree assault. But the jury convicted him of two counts of second degree assault with firearm enhancements. Miller appeals his convictions.

ANALYSIS

A.      SELF-DEFENSE INSTRUCTION

Miller argues that the trial court erred when it instructed the jury that he could not use force in self-defense unless he feared that he was about to suffer "great personal injury." He

6

claims that "about to be injured" is the appropriate standard of law. We conclude that "great personal injury" is the proper standard.[2]

1. Legal Principles

A defendant is entitled to a jury instruction on self-defense when he or she produces "some evidence demonstrating self-defense." *State v. Werner*, 170 Wn.2d 333, 336-37, 241 P.3d 410 (2010). When read as a whole, the jury instructions must make the law of self-defense "manifestly apparent to the average juror." *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). If the jury instruction misstates the law of self-defense, then the error rises to the level of constitutional magnitude and is presumed prejudicial. *Id.* We review de novo whether a jury instruction properly states the law. *State v. Nelson*, 191 Wn.2d 61, 69, 419 P.3d 410 (2018).

RCW 9A.16.020(3) provides that the use force is not unlawful "[w]henever used by a party about to be injured" if the force is not more than is necessary. WPIC 17.02 incorporates this "about to be injured" standard. 11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL § 17.02 (4th ed. 2016) (WPIC). Similarly, WPIC 17.04 states that a person is entitled to act on appearances and use self-defense if he or she believes in good faith that he or she is in actual danger of "injury."

RCW 9A.16.050(1) states that a *homicide* is justifiable when the slayer has reasonable ground to apprehend that the person slain would do some "great personal injury" to the slayer. WPIC 16.02 and WPIC 16.07 incorporate this "great personal injury" standard for homicide cases.

---

[2] Initially, the State argues that Miller was not entitled to any self-defense instructions because his actions were unjustifiable as a matter of law. But the State did not object to the trial court's self-defense instructions and did not file a cross appeal. Therefore, we decline to address this issue.

When a defendant uses nondeadly force in self-defense, the "about to be injured" standard applies. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). However, the Supreme Court in *Walden* applied the "great personal injury" standard from the homicide statute to any case where the defendant used deadly force. 131 Wn.2d at 474. The court stated, "Deadly force may only be used in self-defense if the defendant reasonably believes he or she is threatened with death or 'great personal injury.' " *Id.* (quoting RCW 9A.16.050(1)). The court confirmed this rule in *Kyllo*, stating that the term "great personal injury" describes "the type of harm that, if reasonably apprehended by the defendant, would justify use of deadly force in self-defense." 166 Wn.2d at 866-67.

Miller argues that the "great personal injury" standard applies only in homicide cases under RCW 9A.16.050(1) and the homicide-related WPICs. He relies on *State v. Woods*, where the court stated that "in cases not involving death, the use of force is justified if the defendant reasonably believed he was about to be injured." 138 Wn. App. 191, 201, 156 P.3d 309 (2007).

However, the Supreme Court in *Walden* unequivocally adopted the "great personal injury" standard for the use of deadly force in assault cases that did not involve a homicide. 131 Wn.2d at 471, 474. The court in *Woods* failed acknowledge that *Walden* distinguished between deadly force and nondeadly force, not between death and no death.

2.    Applicable Self-Defense Standard

Under *Walden* and *Kyllo*, the issue is whether Miller used deadly force in defending himself. RCW 9A.16.010(2) defines deadly force as "the intentional application of force through the use of firearms or any other *means reasonably likely to cause death or serious physical injury*." (Emphasis added.) Here, Miller's actions fall within this definition because he shot a firearm in the direction of others in attempt to defend himself.

Miller argues that his actions did not qualify as deadly force because he did not intend to shoot anyone and he did not apply force because his shots did not hit anyone. Therefore, he claims that there was no intentional application of force. However, the definition of deadly force does not require an intent to injure. Only the application of force must be intentional. It is undisputed that Miller intentionally fired at least two of the shots. And there is no requirement that someone be injured. Shooting a firearm in the direction of someone necessarily constitutes an application of force.[3]

We conclude that Miller used deadly force when he fired his gun in the direction of other people. Therefore, the "great personal injury" standard was appropriate under *Walden* and *Kyllo*. We hold that the trial court did not err in giving instructions 23 and 26 that incorporated that standard.

B.   LESSER INCLUDED OFFENSE INSTRUCTION

Miller argues that the trial court erred when it declined to instruct the jury on the lesser included offense of unlawful display of a firearm based the court's interpretation of the "place of abode" exception under RCW 9.41.270(3)(a). We disagree.

1.   Legal Principles

RCW 10.61.006 provides a defendant with a statutory right to a lesser included offense instruction. *State v. Condon*, 182 Wn.2d 307, 316, 343 P.3d 357 (2015). There is a two-pronged test for determining whether a lesser included offense instruction must be given: (1) whether "each of the elements of the lesser offense is a necessary element of the charged offense" (legal prong), and (2) whether "the evidence in the case supports an inference that the lesser crime was

---

[3] Miller also argues that the use of "deadly force" is only at issue when a police officer uses such force. But he offers no authority to support this argument, and the argument is inconsistent with *Walden*.

committed" (factual prong). *State v. Henderson*, 182 Wn.2d 734, 742, 344 P.3d 1207 (2015)

(citing *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). Under the factual prong,

"[a] jury must be allowed to consider a lesser included offense if the evidence, when viewed in

the light most favorable to the defendant, raises an inference that the defendant committed the

lesser crime instead of the greater crime." *Henderson*, 182 Wn.2d at 736.

We review the legal prong of this test de novo, and we review the factual prong for an

abuse of discretion. *Condon*, 182 Wn.2d at 315-16. The trial court necessarily abuses its

discretion if it declines to give a lesser included offense instruction when the evidence would

permit a jury rationally to convict only on the inferior offense and acquit on the greater offense.

*See State v. Fernandez-Medina*, 141 Wn.2d 448, 456, 6 P.3d 1150 (2000).

### 2. Place of Abode Exception

Miller argues that the trial court erred when it declined to instruct the jury on the lesser

included offense of unlawful display of a firearm based the court's interpretation of the "place of

abode" exception under RCW 9.41.270(3)(a). He claims that he could have been prosecuted for

unlawful display of a firearm because his front porch was not a part of his dwelling. We agree

with the trial court that Miller's front porch was part of his place of abode, and therefore that

Miller cannot satisfy the factual prong of the *Workman* test.[4]

#### a. Legal Principles

As stated above, RCW 9.41.270(3)(a) provides that a person has not unlawfully displayed

a firearm if the person's conduct occurred "while in his or her place of abode." However, the

statute does not define "place of abode." *See State v. Smith*, 118 Wn. App. 480, 484, 93 P.3d

---

[4] The State argues that Miller was not entitled to a lesser included instruction because neither *Workman* prong was satisfied in this case even without application of RCW 9.41.270(3)(a). Because we affirm the trial court's place of abode ruling, we do not address this issue.

877 (2003). This court in *State v. Owens* stated that the plain meaning of "abode" is a person's home or residence. 180 Wn. App. 846, 853-54, 324 P.3d 757 (2014). The question here is whether Miller's front porch was a part of his mobile home.

In *State v. Haley*, Division Three of this court held that the defendant could not be prosecuted for unlawful display of a firearm under RCW 9.41.270(1) because the backyard deck attached to his house where he was standing while displaying a BB gun constituted an extension of his abode. 35 Wn. App. 96, 97-98, 665 P.2d 1375 (1983). The deck was large with railing around all three sides ranging from three to 11 feet high and was accessible from multiple points within the house. *Id.* at 97. There was a swimming pool in the middle of the deck. *Id.* The deck was situated above a steep, wooded hill. *Id.*

The court concluded, "From the description given of the deck and its surroundings, and in light of the rule that criminal statutes are to be construed strictly against the State and in favor of the accused . . . , we hold the deck was an extension of the dwelling and therefore a part of the abode." *Id.* at 98.

In *Smith*, Division One held that the defendant's backyard did not qualify as his place of abode. 118 Wn. App. at 484-85. The defendant argued that the place of abode exception applied as long as he remained on his property. *Id.* at 484. The court rejected this argument:

> This interpretation contradicts the purpose of RCW 9.41.270(1), which is to promote public safety by protecting people against those who carry weapons in a threatening manner. The place of abode exception comports with this purpose because one has a legitimate privacy right in his or her home, and the exception does not endanger the public by including behavior that occurs in an area exposed to the public.

*Id.* The court also noted that "[t]he "word 'in' clearly implies inside, not one's backyard. If the Legislature wanted to enact a broader exception, it could have used 'at' rather than 'in.' " *Id.*

In a footnote, the court questioned the holding in *Haley* but also distinguished the facts:

> Unlike the deck in *Haley*, the backyard here is not an extension of Smith's residence. While Haley's deck was on the inner part of his property and attached to his residence, yards typically abut neighboring properties. This means that a person's conduct in his or her yard may extend beyond his or her property. . . . [Smith's] behavior was not contained to an audience on his property; he intended that his behavior traverse the fence to communicate threats.

*Id.* at 485 n.8.

In *Owens*, this court addressed a situation where the defendant walked with a rifle from the back door of his house toward a detached garage 20 to 30 feet away from the house. 180 Wn. App. at 849. The court suggested that RCW 9.41.270(3)(a) would apply to a "structure attached to [defendant's] residence." *Id.* at 855. But the court concluded that RCW 9.41.270(3)(a) did not apply under the facts of that case because the defendant "was neither inside his residence nor on a structure attached to his residence." *Id.*

b.    Analysis

The facts in this case are more similar to *Haley* than to *Smith*. Like the deck in *Haley*, Miller's porch was attached to and part of his mobile home. Therefore, as in *Haley*, the porch was "an extension of the dwelling and therefore a part of the abode." 35 Wn. App. at 98. And we agree with this court's statement in *Owens* that a structure attached to a residence can constitute a place of abode. 180 Wn. App. at 855.

Miller's porch certainly was not as elaborate as the deck in *Haley* and actually was quite small. And the porch was uncovered and contained no accessories. But the mobile home also was small and a defendant should not lose the protection of RCW 9.41.270(3)(a) simply because he or she lives in a mobile home as opposed to a larger house with a more "formal" porch area. And an attached porch is significantly different than the backyard in *Smith* or the area between a house and a detached garage in *Owens*.

Under the specific facts of this case, we conclude that Miller's front porch was part of his "place of abode" and therefore that RCW 9.41.270(3)(a) would prevent him from being prosecuted for the unlawful display of a firearm. Accordingly, we hold that the trial court did not err in declining to give a lesser included offense instruction on the unlawful display of a firearm.

### 3. Procedural Due Process

Miller argues that the trial court's failure to instruct the jury on unlawful display of a firearm violated his Fourteenth Amendment right to procedural due process. He proposes that we apply the *Mathews*[5] balancing test to determine that his procedural due process rights have been violated.

However, Miller does not expressly argue that due process would entitle him to a lesser included offense instruction even if he cannot satisfy the *Workman* test. He argues that the refusal to instruct on an "applicable" lesser included offense would violate due process. However, as discussed above, a lesser included offense instruction on unlawful display of a firearm is not applicable here. Therefore, we do not address this issue.

### C. REQUEST FOR NEW COUNSEL

Miller argues that the trial court's refusal to substitute new counsel violated his Sixth Amendment right to effective assistance of counsel. He claims that the court failed to adequately inquire into his conflict with his attorney. We disagree.

### 1. Legal Principles

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, a criminal defendant has a constitutional right to counsel.

---

[5] *Mathews v. Eldridge*, 424 U.S. 319, 334-35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

However, this constitutional right does not include an absolute right to choose his counsel. *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). A defendant bears the burden to show good cause to justify replacing appointed defense counsel. *Id.* Good cause includes a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication. *Id.* But the defendant's general dissatisfaction with or loss of trust or confidence in defense counsel is not sufficient cause to appoint new counsel. *Id.* The defendant and appointed counsel's relationship must be so diminished as to prevent presentation of an adequate defense. *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997).

We review a trial court's refusal to appoint new counsel for an abuse of discretion. *State v. Lindsey*, 177 Wn. App. 233, 248, 311 P.3d 61 (2013). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.* at 248-49. When reviewing the trial court's refusal to appoint new counsel, we consider (1) the extent of the conflict between the attorney and the client, (2) the adequacy of the trial court's inquiry into the conflict, and (3) the motion's timeliness. *Id.* at 249.

An adequate inquiry requires a "meaningful" inquiry that includes a "full airing" of the defendant's concerns. *State v. Cross*, 156 Wn.2d 580, 610, 132 P.3d 80 (2006), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). The trial court's inquiry should provide a satisfactory basis that shows it reached an informed decision. *State v. Thompson*, 169 Wn. App. 436, 462, 290 P.3d 996 (2012).

2.    Analysis

First, Miller fails to explain on appeal the exact nature of his conflict with his attorney. To the extent that Miller claims that his conflict stemmed from his displeasure that his attorney

advised him to take the State's plea offer, a disagreement over strategy does not qualify as a conflict of interest, which the trial court explained twice to him. *See Cross*, 156 Wn.2d at 607.

To the extent that Miller argues that his relationship with his attorney had completely collapsed or that there was irreconcilable conflict, the record shows that Miller and his attorney had meetings to review discovery and discuss Miller's options. Moreover, Miller's attorney was able to present an effective defense at trial, which resulted in an acquittal on all three counts of first degree assault, and an acquittal on one count of second degree assault. Therefore, we conclude that Miller failed to show good cause to justify replacing his appointed defense counsel.

Second, there is substantial evidence in the record to support the trial court's denial of Miller's request for new counsel. Miller essentially raised the same concerns about his dissatisfaction with his attorney's legal advice at two different hearings. And based on statements from Miller and his attorney, the court determined that Miller failed to allege any actual conflict that required reappointment of counsel and explained each time that a defense counsel has the obligation to thoroughly advise a client of all the risks associated with each available option.

Third, the trial court adequately inquired into Miller's concerns. In May 2019, Miller complained that he did not get along with his attorney because his attorney was trying to force him to take a plea deal and that his attorney was not prioritizing his case. The court engaged in a colloquy with Miller explaining why his dissatisfaction with his attorney's legal advice did not qualify as a basis to appoint new counsel. The court also explained that appointing new counsel would result in another continuance, whereas Miller's attorney already was familiar with his case.

15

In September, Miller again requested the trial court to appoint new counsel to his case, citing irreconcilable conflict with his attorney. He alleged that his attorney was not prepared to represent Miller at trial due to the lack of discovery from the State and that Miller had to repeatedly defend his innocence during his meetings with his attorney. The trial court then asked Miller's attorney to respond, to which Miller's attorney assured the court that Miller already saw all the discovery through the course of several meetings in the presence of his investigator. Although Miller's attorney conceded that his conversations with Miller had been difficult, Miller's attorney never indicated that he could not adequately represent Miller at trial. The court again explained that Miller's displeasure with his attorney's legal advice did not qualify as an actual ethical conflict in representing Miller.

Miller primarily relies on *United States v. Adelzo-Gonzales*, 268 F.3d 772, 777-78 (9th Cir. 2001), to argue that the trial court was required to ask specific and targeted questions to make a meaningful evaluation of the nature and extent of his conflict with his attorney. In that case, the Ninth Circuit determined that the trial court's open-ended questions were insufficient to ascertain the nature of the defendant's relationship with the appointed counsel because there were "striking signs of a serious conflict." *Id.* at 778. For example, the defendant alleged that his attorney used foul language and threatened to " 'sink [him] for 105 years so that [he] wouldn't be able to see [his] wife and children,' " and the appointed counsel made an explicit attempt to block his client's efforts to make the motion for new counsel and openly called his client a liar. *Id.* at 778. None of those facts are present here and the trial court was not required to probe any deeper into Miller's dissatisfaction with his attorney's valid legal advice.

We hold that the trial court adequately inquired into Miller's concerns with his appointed counsel. Therefore, the court did not err when it denied Miller's request for new counsel.

CONCLUSION

We affirm Miller's second degree assault convictions.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

MAXA, P.J.

We concur:

CRUSER, J.

VELJACIC, J.