IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38350-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| FELIPE LUIS JR. | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Felipe Luis Jr. appeals his judgment and sentence, imposed as a result of his conviction for first degree manslaughter. Finding no error, we affirm.

FACTS

On December 9, 2018, Felipe Luis Jr. was housed in the Yakima County jail's Norteño gang unit, along with Julian Gonzales, Deryk Donato, and Jacob Ozuna. At around 11:30 p.m., a corrections officer looked into the unit and saw an inmate on the ground, surrounded by other inmates. After calling for backup, several officers and medical staff entered the unit and found Mr. Ozuna on the floor unconscious, but still alive, and with extreme blunt force injuries. Officers observed pools of blood, as well as blood streaked on the walls, floor, and stairway, and on the hands of Mr. Luis, Mr. Donato, and Mr. Gonzales. Mr. Ozuna was transported to the hospital where he died shortly after.

*Description of the incident*

The attack on Mr. Ozuna was captured by nonaudio surveillance cameras. Video footage revealed Mr. Ozuna on the second floor of the unit talking to another inmate. Mr. Luis, Mr. Donato, and Mr. Gonzales were downstairs and can be seen talking and shaking hands. Mr. Luis and the two other men then went upstairs, approached Mr. Ozuna from behind, and initiated an attack. For 12 minutes, the three men continuously punched, kicked, and stomped on Mr. Ozuna. When Mr. Ozuna tried to get away, he was cornered and taken to the ground. When Mr. Ozuna appeared to lose consciousness, the beating did not stop; the three assailants kept punching and kicking Mr. Ozuna's body, including his face. Mr. Luis, Mr. Donato, and Mr. Gonzales briefly took a break to drag Mr. Ozuna along the hallway to the top of the stairs. When Mr. Ozuna started to move again, the beating resumed until Mr. Ozuna became nonresponsive. The three men then dragged Mr. Ozuna by his feet down the stairs of the unit, causing him to hit his head on each individual stair. Once at the bottom of the stairs, Mr. Ozuna appeared to move his arm. In response, Mr. Luis and his companions repeatedly kicked Mr. Ozuna in the face until he stopped moving.

During the attack, another inmate, Lindsey Albright, took items from Mr. Ozuna's cell and brought them back to his own cell. When officers later asked for the items,

2

Mr. Albright handed them, among other things, a document listing the "14 bonds" of the Norteño gang. 1 Rep. of Proc. (RP) (Nov. 12, 2020) at 125-26.

Mr. Ozuna's autopsy revealed swelling around his head and face, bleeding in his nose and mouth, minor injuries to his hand and wrist, bruising on his neck, bruising on his chest, bruising and abrasions on his upper extremities, bruising on his right abdomen and pelvic areas, broken ribs, a liter of blood in his chest cavity, a bruise to his heart lining, contusions to his lungs, a hemorrhage near his kidneys, a one and one-half inch laceration on his scalp, and bruising and impact injuries on his skull. Although he had no skull fractures or major vessels torn, the beating caused Mr. Ozuna's brain to move around inside his skull and swell to the point where it cut off its own blood supply. Mr. Ozuna's official cause of death was rapid swelling of the brain resulting in respiratory failure. His official manner of death was homicide.

*Charges*

Mr. Luis, Mr. Donato, and Mr. Gonzales were each charged with Mr. Ozuna's murder. Their cases were joined for trial until the court granted a motion to sever.

The information filed against Mr. Luis charged two offenses. Count 1 charged aggravated first degree murder. One of the alleged aggravating circumstances was a gang aggravator under RCW 10.95.020(6). This aggravator alleged the murder was "committed

to obtain or maintain [Mr. Luis's] membership or to advance [his] position in the

hierarchy of an organization, association, or identifiable group." Clerk's Papers (CP) at 4.

Count 2 charged Mr. Luis with unaggravated first degree murder.[1] This charge carried a

gang enhancement that alleged the murder was committed "with intent to directly or

indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for

[any] criminal street gang as defined [by] RCW 9.94A.030, its reputation, influence, or

membership." *Id*. at 5.

*April 10, 2019 motion to continue*

Mr. Luis was arraigned on January 2, 2019. On January 31, 2019, Mr. Luis

appeared in court and waived his right to a speedy trial. Although there is no transcript

of the January 31 hearing in the record on review, the parties agree the purpose of the

continuance was to perform DNA testing.[2] Mr. Luis signed a speedy trial waiver,

agreeing to a trial date of May 6, 2019, with a readiness hearing set for April 10, 2019.

---

[1] Aggravated first degree murder is punished by a maximum penalty of life imprisonment without the possibility of parole. RCW 10.95.030. Unaggravated first degree murder is punished by a maximum penalty of life imprisonment. RCW 9A.32.030(2); RCW 9A.20.021(1)(a). An enhancement, if found by a jury, would allow the court to impose a sentence above the standard range. RCW 9.94A.535(3).
[2] According to the State, a recording for the January 31, 2019, hearing is not attainable. Br. of Resp't at 7 n.3.

The parties appeared as scheduled on April 10. At the beginning of the hearing, counsel for the State explained the Washington State Patrol Crime Laboratory was not done with its DNA analysis and the process would not likely be complete until June. The defense voiced concern that the State had not identified what efforts had been made to obtain the DNA testing in a timely manner. The State's attorney did not provide an explanation, but stated that if Mr. Luis "wants to go to trial . . . we can go to trial" so long as defense counsel represented he was ready. 1 RP (Apr. 10, 2019) at 9. Mr. Luis's attorney did not say he was ready for trial, but he also did not specifically ask for a continuance. Rather, defense counsel said, "We're not asking for [a continuance] at this time. We're asking for the DNA [analysis]. And we're asking for what efforts they've made to get the DNA [testing] done in a timely manner." *Id*. at 9-10. Given defense counsel's statements, the prosecutor asked for a continuance to allow for the completion of DNA testing. The court then found good cause for a continuance. The court asked defense counsel if there would be any prejudice to Mr. Luis by the continuance. Defense counsel stated, "No." *Id*. at 11. The court then continued the trial date to August 12, 2019.[3]

---

[3] During the hearing Mr. Luis astutely asked, "What is the DNA [testing] for when there's a video?" *Id*. at 13. The trial court responded by advising Mr. Luis to confer with his counsel.

At a June 19, 2019, readiness hearing, the court was informed the DNA analysis had been received.

Brady[4] *motion*

On April 13, 2021, Mr. Luis filed a *Brady* motion for discovery. Mr. Luis specifically asked for any exculpatory or impeaching evidence related to Mr. Ozuna and his purported murder of Dario Alvarado. The State affirmed it had complied with the *Brady* requirements.

*Motion in limine and* Knapstad[5] *motion*

In a motion in limine, the State moved to admit gang association evidence to establish its theory for motive. The State asserted Mr. Ozuna's killing was gang related. Evidence revealed Mr. Ozuna had been in custody for the alleged murder of Dario Alvarado on May 10, 2018. The State claimed both Mr. Ozuna and Mr. Alvarado were members of the Norteño gang. Expert testimony regarding the Norteños revealed they had a "constitution" called the "14 bonds." 1 RP (Nov. 12, 2020) at 233. Norteño members must abide by the 14 bonds or risk being punished. The State theorized Mr. Ozuna had broken one of the bonds by killing Mr. Alvarado, a fellow Norteño, and thus needed to

---

[4] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
[5] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

be disciplined. Testimony revealed Mr. Luis and his codefendants are also Norteño gang

members, who, the State claimed, were ordered to carry out the discipline. According to

the State's evidence, if a Norteño receives no repercussions for violating a bond, one

could assume the bond was approved.

Mr. Luis objected to the State's motion, arguing the evidence failed to establish a

nexus between Mr. Luis's gang affiliation and the crime, and was prejudicial. Mr. Luis

also joined his codefendants in filing a *Knapstad* motion to dismiss count 1, the

aggravated murder charge, claiming the police testimony and gang expert testimony

provided insufficient evidence, standing alone, to support an aggravating factor.

The trial court held a consolidated hearing on the two motions, ultimately denying

Mr. Luis's motion to dismiss count 1 and granting the State's motion to admit gang

evidence.

*Trial*

The case proceeded to a jury trial. The jury viewed the surveillance videos along

with photographs depicting the scene and of Mr. Ozuna's injuries. The jury also heard

testimony from various law enforcement officers about gang membership and the State's

theory that Mr. Ozuna was killed for gang-related reasons. This testimony was consistent

with what had been set forth in the motion in limine.

In the defense case, Mr. Luis presented testimony from employees of the Yakima County Department of Corrections who admitted Mr. Alvarado into custody in 2018. According to the witnesses, Mr. Alvarado identified himself as a "drop" during the intake process. 4 RP (Jun. 4, 2021) at 1762-63, 1768; Ex. 87. This meant he was no longer affiliated with a gang and should not be housed in a gang area. *Id*. Mr. Alvarado's intake paperwork noted he had not been affiliated with a gang for approximately 10 years. Ex. 87.

*Jury instructions, conviction and sentencing*

The court granted a defense request for a jury instruction on manslaughter in the first degree, but denied an instruction based on manslaughter in the second degree, finding it was factually unwarranted. The jury convicted Mr. Luis of first degree manslaughter. It did not return a verdict on the gang enhancement.

*Sentencing*

The defense filed a motion requesting an exceptional sentence below the standard guideline range based largely on Mr. Luis's youth. The court recognized it had discretion to grant the motion, but declined to do so.

The court reasoned Mr. Luis was "more sophisticated than most 19-year olds." RP (Jul. 15, 2021) at 42-43. Given the prolonged nature of the attack, the court found

8

Mr. Luis had not acted impetuously or without recognizing the consequences of his actions. The court did not find Mr. Luis's actions were unduly influenced by his associates at the jail or by his difficult childhood. And the court noted Mr. Luis had already gone through the juvenile court system with no discernable progress toward rehabilitation.

The court imposed the maximum of the standard range of 147 months. Mr. Luis timely appeals.

## ANALYSIS

*Gang evidence*

Mr. Luis contends the trial court improperly allowed the State to present gang evidence under ER 404(b). According to Mr. Luis, the claim that Mr. Ozuna's murder was gang related was entirely speculative. Furthermore, he argues the State's theory that Mr. Ozuna was killed as punishment for killing another gang member was undercut by evidence that Mr. Alvarado was actually a dropout. We review a trial court's ER 404(b) decision for abuse of discretion. *State v. Embry*, 171 Wn. App. 714, 731, 287 P.3d 648 (2012). Even if a trial court abuses its discretion, reversal is unwarranted if the error was harmless. *State v. Scott*, 151 Wn. App. 520, 529, 213 P.3d 71 (2009).

We are not particularly swayed by the substance of Mr. Luis's ER 404(b) claim.

Although the evidence supporting the State's theory of the case was circumstantial, it was

significant. The State's evidence raised a reasonable inference that Mr. Ozuna was killed

in an orchestrated manner in accordance with the Norteño code of conduct. While the

defense produced some evidence that Mr. Alvarado had dropped out of the Norteño gang,

the evidence was not so strong that it eviscerated the State's theory. Thus, we are inclined

to agree with the trial court that the State was entitled to present its gang evidence under

ER 404(b).[6]

But regardless of any ER 404(b) error, Mr. Luis cannot get past the State's claim

of harmless error. "Evidentiary error can be harmless if, within reasonable probability, it

did not materially affect the verdict." *Scott*, 151 Wn. App. at 529 (citing *State v. Zwicker*,

105 Wn.2d 228, 243, 713 P.2d 1101 (1986)). Mr. Luis was acquitted of aggravated first

degree murder, which was predicated on a gang allegation. And the jury did not issue a

gang enhancement. Thus, there is no direct basis for concluding the gang evidence

negatively impacted Mr. Luis's case.

---

[6] A more thorough discussion of the ER 404(b) analysis is set forth in our decision in the companion case of *State v. Donato*, No. 38621-0-III (Wash. Ct. App. Dec. 28, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/386210_unp.pdf.

Mr. Luis argues the ER 404(b) evidence was harmful because it portrayed him in a negative light. We are unpersuaded. For one thing, the jury necessarily knew Mr. Luis was in jail at the time of the offense; thus, it was unavoidable he would not be perceived as someone free from any criminal association. But more importantly, the video evidence documented Mr. Luis's participation in a brutal, intentional beating that was prolonged and cruel. Given the strength of the video evidence, it is not reasonably probable the State's gang evidence impacted the jury's manslaughter verdict.

Brady

Mr. Luis contends the state violated its *Brady* obligation to disclose exculpatory evidence when it failed to produce the jail records establishing Mr. Alvarado's gang drop out status. Our review is de novo. *State v. Mullen*, 171 Wn.2d 881, 894, 259 P.3d 158 (2011). Relief under *Brady* requires a showing of prejudice. *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 486-87, 276 P.3d 286 (2012). In this context, prejudice turns on whether it is reasonably probable that, with proper disclosure, the result of the proceeding would have been different. *In re Pers. Restraint of Mulamba*, 199 Wn.2d 488, 498, 508 P.3d 645 (2022).

Mr. Luis's *Brady* claim fails for lack of prejudice. Regardless of whether the State should have produced information about Mr. Alvarado before trial, there is not a

11

reasonable probability that early disclosure would have yielded a different result. Mr. Luis

had the information about Mr. Alvarado at trial and was able to use it in his case-in-chief.

Perhaps based on Mr. Luis's presentation of Mr. Alvarado's gang drop status, the jury did

not return any gang related verdicts.

Mr. Luis recognizes that he had the Alvarado information at trial and that the jury

did not issue a gang-related verdict; nevertheless, he insists there was prejudice because

earlier disclosure would have prevented the trial court from allowing the presentation of

gang evidence at trial. We reject Mr. Luis's analysis. Even if the information regarding

Mr. Alvarado would have changed the trial court's decision to admit gang evidence,[7]

the introduction of the gang evidence did not prejudice the outcome of Mr. Luis's case.

*Lesser-included offense jury instruction*

Mr. Luis challenges the trial court's refusal to instruct the theory on second degree

manslaughter. A defendant is entitled to a lesser-included offense jury instruction when

---

[7] This proposition is dubious. We disagree with Mr. Luis's argument that the information about Mr. Alvarado was "thoroughly impeaching." Am. Appellant's Br. at 32-33. Mr. Alvarado's purported claim during 2018 that he had not been involved with gangs for 10 years was impeached by evidence demonstrating his gang involvement in 2011, 2014, and 2015. *See* 4 RP (Jun. 2, 2021) at 1523-28, 1535-46, 1552-53. Additionally, at the time Mr. Alvarado was booked into jail in April 2018, his listed property included red shoes and a red shirt. 4 RP (Jun. 4, 2021) 1783. Red is a color association with the Norteños. 3 RP (Jun. 2, 2021) 1453, 4 RP (Jun. 4, 2021) 1783. There was no evidence at trial indicating Norteños members viewed Mr. Alvarado as a dropout.

two prongs are met: (1) under the legal prong, each element of the lesser offense must be a necessary element of the charged offense, *see* RCW 10.61.006, and (2) under the factual prong, the evidence must support an inference that only the lesser crime was committed. *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978).

The parties agree that, under the legal prong of the analysis, second degree manslaughter is a lesser-included offense of the charged crimes of aggravated first degree premeditated murder and first degree premeditated murder.

The disagreement pertains to the factual prong. The factual prong is satisfied if the facts of the case "raise a possible inference that the defendant committed the lesser offense but did not commit the charged offense." *State v. Henderson*, 180 Wn. App. 138, 144, 321 P.3d 298 (2014), *aff'd*, 182 Wn.2d 734, 344 P.3d 1207 (2015). If viewing the evidence in the light most favorable to the defense, "'the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater, a lesser included offense instruction should be given.'" *Id*. (quoting *State v. Berlin*, 133 Wn.2d 541, 551, 947 P.2d 700 (1997)). We review a trial court's decision regarding whether to issue a lesser-included instruction under the factual prong for abuse of discretion. *Id*.

The difference between the charged crimes of premeditated murder and the

lesser-included offense of second degree manslaughter pertains to the defendant's

mental state. Premeditated murder requires proof of intent to kill. RCW 9A.32.030(1)(a);

*see also* RCW 10.95.020(6). In contrast, second degree manslaughter requires only that

the defendant acted with criminal negligence. RCW 9A.32.070(1). In this context, a

person acts with criminal negligence when they "fail[] to be aware of a substantial risk

that a *homicide* may occur." *Henderson*, 180 Wn. App. at 149.[8]

The video evidence dooms Mr. Luis's theory of criminal negligence. The video

shows the attack against Mr. Ozuna was deliberate, lengthy, and brutal. Mr. Luis and

his associates repeatedly punched and kicked Mr. Ozuna to the point where Mr. Ozuna

became unconscious. When Mr. Ozuna showed any sign of movement, the assault

resumed until Mr. Ozuna was completely nonresponsive. Given the egregious

circumstances documented in the video, no rational jury could find Mr. Luis failed to

be aware of a substantial risk Mr. Ozuna would die from the attack. *See Henderson*,

180 Wn. App. at 149. Rather, the jury "must necessarily" have at least found "a conscious

disregard of a substantial risk of homicide," consistent with the conviction for first degree

---

[8] In contrast, first degree manslaughter requires a mental state of recklessness. *State v. Warden*, 133 Wn.2d 559, 563, 947 P.2d 708 (1997).

manslaughter. *Id*. The trial court did not abuse its discretion in refusing to give the lesser-included instruction for second degree manslaughter.

*Trial continuance*

Mr. Luis argues the trial court violated his speedy trial rights under CrR 3.3 when it granted a continuance in order to allow the State time to complete DNA testing. Under the speedy trial rule, the time for trial may be extended based on a party's motion for continuance. CrR 3.3(f)(2). We review a trial court's decision on whether to grant a continuance for abuse of discretion. *State v. Denton*, 23 Wn. App. 2d 437, 449, 516 P.3d 422 (2022). A trial court abuses its discretion if it continues a trial over the defendant's objection based on general concerns of congestion or backlogs. *Id*. at 451-52.[9] Violation of the speedy trial rule requires dismissal with prejudice. CrR 3.3(h).

While founded on the constitutional right to a speedy trial, the time for trial rule set by CrR 3.3 "is not of constitutional magnitude." *State v. White*, 94 Wn.2d 498, 501, 617 P.2d 998 (1980), *abrogated on other grounds by State v. Walker*, 199 Wn.2d 796,

---

[9] Congestion or backlogs in the courts, prosecuting attorney's office, or crime labs will justify a continuance over the defendant's objection only in exceptional circumstances. *Id*. at 450. If the State believes exceptional circumstances justify a continuance over the defendant's objection it must specify the nature of the exceptional circumstances, what steps have been taken to address the congestion or backlog, and "a reasonable time frame within which the case can be brought to trial." *Id*.

805-06, 513 P.3d 111 (2022). Thus, error preservation is critical. *See* RAP 2.5(a). In order

to preserve a rule-based speedy trial argument for appeal, a defendant must assert a timely

objection. *State v. MacNeven*, 173 Wn. App. 265, 268-69, 293 P.3d 1241 (2013).

Preserving a speedy trial objection allows the court to address speedy trial problems by

"by resetting the trial date within the timely trial period or by determining whether there

was good cause for a continuance." *Id*. at 269. When a defendant objects to the basis

for a continuance, not merely the date set, a written objection is not required under

CrR 3.3(d)(3). *Denton*, 23 Wn. App. 2d at 460 n.10. Nevertheless, an objection is still

required. *Id*.

Here, Mr. Luis failed to articulate a valid objection to the court's decision to

grant the State's continuance motion. Mr. Luis was given the opportunity to proceed to

trial as scheduled on May 6, 2019, without the DNA evidence. Yet he did not seize it.

He instead asserted he wanted the DNA evidence. Although Mr. Luis's attorney said he

was not asking for a continuance and he expressed dissatisfaction with the State's failure

to explain the delay with the crime lab, nothing in the record could be construed as

indicating Mr. Luis wished to proceed to trial on May 6.

This case contrasts with *Denton* where the defendant stated he objected to the

State's continuance and wanted to go to trial without the DNA evidence that formed

the basis for the State's continuance request. *Denton*, 23 Wn. App. 2d at 444. Although

Mr. Luis did personally question the need for DNA evidence during his April 10 hearing,

he never asserted that he wished to go to trial in May or that he wanted to go to trial

without the DNA evidence. Furthermore, when it comes to a speedy trial objection, a

defendant is bound by the representations of their attorney. *Id.* at 448-49.

Based on the unique circumstances of this case, the trial court did not abuse its

discretion in finding good cause for a continuance.

*Sentencing*

Mr. Luis challenges his standard range sentence, arguing the trial court failed to

meaningfully consider an exceptional sentence downward based on the mitigating

circumstances of youth. We disagree.

Appeals of standard range sentences are generally prohibited. RCW 9.94A.585(1).

When a defendant challenges the denial of an exceptional sentence downward, appellate

review turns on proof of legal error, such as a categorical refusal to exercise discretion

or the mistaken belief of a lack of discretion to impose a nonguideline sentence. *State v.*

*McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017); *State v. Grayson*, 154 Wn.2d 333,

342, 111 P.3d 1183 (2005).

We discern no legal error in the trial court's denial of Mr. Luis's request for an

exceptional sentence downward. The court recognized its authority to impose an exceptional sentence based on Mr. Luis's youth. *See State v. O'Dell*, 183 Wn.2d 680, 689, 358 P.3d 359 (2015).[10] It carefully reviewed Mr. Luis's individual circumstances and concluded Mr. Luis's culpability was not mitigated by his young age or immaturity. Mr. Luis has not shown any legal error warranting review of the trial court's standard range sentence.

## CONCLUSION

The judgment and sentence is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____
Staab, J.

_____
Cooney, J.

---

[10] Because Mr. Luis was not a juvenile at the time of his offense, the court was not *required* to consider the mitigating qualities of youth as set forth in *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017).